# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

RDK TRUCK SALES AND             :
SERVICE INC. and RDK            :
MUNICIPAL TRUCK CENTER, INC.    :        CIVIL ACTION
        Plaintiff,              :
                                :
        v.                      :
                                :
MACK TRUCKS, INC.,              :        NO.  04-4007
MCNEILUS TRUCK                  :
MANUFACTURING, INC., and HEIL   :
ENVIRONMENTAL INDUSTRIES, LTD., :
        Defendants.             :

---

MACK TRUCKS, INC.,              :
        Counterclaim Plaintiff, :
                                :
        v.                      :
                                :
RDK TRUCK SALES AND SERVICE     :
INC. and RDK MUNICIPAL          :
TRUCK CENTER, INC.,             :
        Counterclaim Defendants. :
                                :

## MEMORANDUM

BUCKWALTER, S. J.                                          May 19, 2009

## I.  PROCEDURAL BACKGROUND

### A.    Defendants' Motion in Summary Judgment

This suit is about the sale of garbage trucks, specifically, Mack garbage trucks.

Plaintiff RDK Truck Sales and Service Incorporated and RDK Municipal Truck Center[1]

(collectively RDK) promotes itself as a national low-cost provider of garbage trucks—a position

---

1.  Plaintiffs are part of the same parent corporation – RDK Truck Sales and Services focuses upon sales to private businesses, while RDK Municipal sells to local governments and municipalities.

which it believes threatened others in the garbage truck industry.  RDK alleges that given its

position as a low-cost leader, Defendants Mack Truck International (Mack), McNeilus Truck and

Manufacturing Incorporated (McNeilus), and Heil Environmental Industries Incorporated (Heil)

(collectively Defendants) engaged in several unlawful actions that form the basis for RDK's

Third Amended Complaint.

On August 23, 2004, RDK filed suit against Defendants claiming that they entered

into various illegal agreements to divide the market for Mack refuse trucks by allocating Mack

customers via coordinated refusals to deal and discriminatory pricing.  (Third Am. Compl. 2.)

Specifically, RDK asserts the following claims: (1) violation of Section 1 of Sherman Act (15

U.S.C. § 1, et seq.) (Id. ¶¶ 64-70); (2) violation of Florida's Antitrust Act (Fla. Stat. § 542.15 et

seq.) (Id. ¶¶ 71-77); (3) violation of Florida's Deceptive and Unfair Trade Practices Act (Fla.

Stat. § 501.201, et seq.) (Id. ¶¶ 78-81); (4) tortious interference with existing and prospective

business relations (all Defendants) (Id. ¶¶ 82-87); and (5) tortious interference with existing and

prospective business relations (only Mack) (Id. ¶¶ 88-913).

Presently before this Court is Defendants' Motion for Summary Judgment.  For

the reasons discussed below, their motion is granted in part and denied in part.

### B.    Mack's Counterclaim

In its Counterclaim, Mack seeks recovery for damages caused by RDK's "long

standing conspiracy to deceive and defraud Mack." (Mack's Answer and Third Am. Compl. 20.)

Specifically, Mack alleges that RDK and several Mack dealers agreed that the dealers "would

purchase trucks from Mack for resale to RDK by misrepresenting to Mack that the trucks were to

be sold to other customers.  Through this ruse, the conspirators induced Mack to provide inflated

discounts, thereby both damaging Mack and unjustly enriching RDK."  (Id.)

   According to Mack, this "game" involved: (1) filing for Mack sales assistance in

the name of companies that are not RDK and then flipping the title for these chassis to RDK (Id.

at ¶ 21); (2) making false business names and requesting sales assistance under those names (Id.

at ¶ 22); (3) requesting sales assistance under real names even though the intent was to sell to

RDK (Id. at ¶ 23); and (4) using the name of a dairy and airport tanker business even though the

intent was to sell to RDK (Id. at ¶ 24).  Mack alleges that RDK committed a civil conspiracy, and

violated Florida's Unfair Practices Act.   (Id. ¶¶ 30-39.)  As a result, Mack seeks: (1)

compensatory money damages; (2) recovery of costs of the suit; (3) disgorgement of all benefits

received; and (4) punitive damages.  (Id. at 25-26.)

### C.  **RDK's Motion for Summary Judgment on Mack's Counterclaim**

   RDK asserts that Mack "has contrived three conspiracy theories" between RDK

and three Mack dealers—Dallas Mack, Worldwide, and Nextran—and has tacked on a "meritless

claim for alleged violations of the Florida Deceptive and Unfair Trade Practices Act."  (Pls.'

Mot. Summ. J. 1.)  RDK alleges that "[t]he entirety of Mack's claims against RDK rest on

misrepresentations allegedly *made to Mack by the three Mack dealers* in the course of requesting

discounts on trucks from Mack."  (Id.) (emphasis in original.)  RDK further states that Mack's

theory lacks factual support and is based upon 'conclusions' adduced by Mack's expert.  (Id.)  As

such, "the record is devoid of any evidence that RDK participated in any wrongdoing in

connection with any of the disputed transactions."  (Id. at 2.)

Mack's original list of fraudulent dealers and deals included seven Mack dealers and 640 chassis. (Id. at 3; Mack's Resp. Mot. Summ. J. 15.) Mack narrowed the list to three dealers, and sixty-four chassis. (Mack's Resp. Mot. Summ. J. 15.)

## II.  FACTUAL BACKGROUND – THE PARTIES

### A.    Mack Truck

Since its founding in 1900, Mack has manufactured a variety of truck platforms for industrial purpose including class 8 (heavy-duty) trucks capable of carrying loads in excess of 33,000 pounds. Mack's heavy duty trucks are not a finished product. Rather, Mack produces the "chassis" which consist of the power train, cab, frame, and wheels. The chassis is fitted with a body tailored to the truck's intended end use.

### B.    Mack Franchisees and the Mack Dealer Council

Mack does not sell directly to end users. Rather, most Mack trucks are sold by Mack's network of 137 independent, franchised dealers. (Defs.' Answer and Countercl. ¶ 8.) In 2006, 83 percent of all Mack chassis were sold by Mack's dealer network. (Defs.' Mot. Summ. J., Ex. 2, Epstein Rep., ¶ 35 n.41.) Dealers operate under a Distributor Agreement that describes Areas of Primary Responsibility (AORs). (Defs.' Mot. Summ. J., Ex. 1, Flaherty Decl. ¶ 5.) In these Agreements, dealers covenant to promote the Mack brand, provide parts and support, maintain a supply of parts, and ensure that their mechanics are proficient in repairing Mack trucks. (Id.) Mack views its dealer network, with their attendant responsibilities, as a key factor in its sales success.

When a Mack dealer buys a Mack chassis, Mack provides price reductions that result in the "distributor net price." (Pls.' Resp. Mot. Summ. J. 8 & Ex. 14, Stephen Polzer

4

Toledo Mack Dep. ("Polzer Dep.") 12-16, Nov. 19, 2003.) Dealers may also request additional "sales assistance" which Mack grants on a case-by-case basis to help complete a particular sale. (Id., Ex. 15, Ronald Gerhard Dep. ("Gerhard Dep.") 51-52, Jan. 18, 2008; Defs.' Mot. Summ. J. Ex. 1, ¶¶ 7-9.) Typically, Mack dealers do not stock chassis on their lots, but order them to specification. (Pls.' Resp. Mot. Summ. J 9; Ex. 16, Ginter Decl.¶ 8.)

To foster communication between Mack and its dealers, the Mack Distributor Council (Council) was created. (Defs.' Mot. Summ. J. 8.) The Council consists of Mack executives, and dealer representatives chosen by their peers. (Pls.' Resp. Mot. Summ. J. 8; Ex. 2, Flaherty Dep. 81:7-14; Ex. 3, Ralich Dep. 77:14-16.) Dealer representatives raise dealer concerns at quarterly Council meetings. (Id., Ex. 3, 77:21-78:16; Id., Ex. 19, Flaherty Toledo Mack Dep. 66:2-3.)

## C.     The Body Builders – McNeilus and Heil

Mack's chassis are of little use until fitted with a body tailored for a specific use. Defendants McNeilus and Heil are two of the biggest makers of garbage truck bodies. Heil sells most of its product through a nationwide network of authorized dealers whereas McNeilus uses its own sales force. Until 2004, Mack directly sold chassis to McNeilus and Heil for their "ready truck" program.[2] (Defs.' Mot. Summ. J. 11; Ex. 23, Jimmy W. Rogers Dep. ("Rogers Dep.) 88:9-89:22, Oct. 31, 2007; & Ex. 4, Barry Duffy Dep. ("Duffy Dep.") 56:21-57:1, Aug. 21, 2007.) Since then, Mack dealers have provided chassis to both body builders. (Id., Ex. 1, Flaherty Decl. ¶ 10.)

---

2.  Ready trucks, as the name suggests, are completed garbage trucks that can be driven off the lot and used immediately. Ready trucks are well-suited for those who do not have any special requirements or do not desire to wait for a truck.

5

      D.    **RDK**

RDK is neither an authorized Mack dealer nor a body builder.  Rather, RDK is an independent, third-party distributor of ready trucks for the garbage industry.  RDK sells many brands of chassis and bodies.  (Defs.' Mot. Summ. J., Ex. 14, Kemner Dep. 5:25-6:20.)  While it does not make bodies, it does install them.  According to Mack, "RDK is a small refuse truck reseller in Tampa, Florida."  (Defs.' Mot. Summ. J. 12.)  By way of comparison, RDK claims that it was founded with the "goal of promoting and selling the Mack brand of refuse trucks," and soon after opening "quickly became one of Mack's best customers."  (Pls.' Resp. to Mot. Summ. J. 11.)

While the parties may disagree about RDK's size and scope, it is clear that RDK operates with a business model that fundamentally differs from Mack's.  Mack utilizes 137 dealers, with 200 locations, while RDK's facilities are concentrated upon fifteen acres in Tampa Bay, Florida.  (Id. at 3, Ex. 7, Kemner Decl. ¶ 7.)  While Mack sees its brick and mortar dealerships as essential to its business model, RDK prefers to market itself by "aggressively advertising low prices nationwide" via the internet and in various trade publications.  (Id. at 6.)

## III.  DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants' Motion for Summary Judgment focuses on each of RDK's claims.  This Court addresses them in turn.

      A.    **Summary Judgment Standard**

A motion for summary judgment will be granted when all of the evidence demonstrates "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c).  A dispute about a material fact is

genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Since a grant of summary judgment will deny a party its chance in court, all inferences must be drawn in the light most favorable to the party opposing the motion. U. S. v. Diebold, Inc., 369 U.S. 654 (1962); Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992) (stating that in a motion for summary judgment, "where the non-moving party's evidence contradicts the movant's, the non-movant's must be taken as true.").

Although the Supreme Court has emphasized that Rule 56 makes absolutely no distinction between antitrust and other cases, the Supreme Court has cautioned that "summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot." Poller v. Columbia Broad. Sys., Inc., 368 U.S. 464, 473 (1962).[3]

### B.    Violations of Section 1 of the Sherman Act[4]

---

3. Commentators have noted that Poller's language has "a limited context" and in "retrospect it is hard to extract a serious antitrust issue from the Poller case." Phillip E. Areeda, Herbert Hovenkamp, & Roger G. Blair; ANTITRUST LAW § 308 (2d. ed. 2008.)

4. Section 1 of the Sherman Act provides that:

> [e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy declared by sections 1 to 7 of this title to be illegal shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $100 million if a corporation, or, if any other person, $1 million, or by imprisonment not exceeding 10 years, or by both said punishments, in the discretion of the court.

15 U.S.C. § 1.

RDK alleges three agreements where Defendants have unreasonably restrained trade in violation of Section 1 of the Sherman Act. First, RDK alleges that Mack, with its dealers, conspired against RDK by denying it access to highly discounted Mack trucks. (Am. Compl. ¶¶ 28-32.) Second, RDK alleges that Mack conspired with the Body Builders, to form a three-way agreement whereby the Body Builders would refuse to sell Mack ready trucks to RDK. (Id. at ¶¶ 34-37.) Finally, RDK alleges that Mack entered into another three-way agreement with the Body Builders to ensure that neither would sell to established customers of Mack dealers. (Id. at ¶ 36.)

Despite its literal language, Section 1 only prohibits contracts, combinations, or conspiracies that unreasonably restrain trade. Bus. Elec. Corp. v. Sharp Elec. Corp., 485 U.S. 717, 723 (1988). Courts have utilized three different standards when examining whether a practice violates Section 1. The rule of reason is the default standard requiring that the factfinder weigh "all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." Cont'l. T.V., Inc. v. GTE Sylvania Inc., 433 U.S. 36, 49 (1977). As such, a plaintiff must prove the following: (1) defendants contracted, combined, or conspired among each other; (2) the combination or conspiracy produced adverse, anti-competitive effects within the relevant product and geographic markets; (3) the objects of and the conduct pursuant to that contract or conspiracy were illegal; and (4) the plaintiffs were injured as a proximate result of that conspiracy. Tunis Bros. Co. v. Ford Motor Co., 763 F.2d 1482, 1489 (3d Cir.1985). This burden may be satisfied by showing actual anticompetitive effects, increase in price, or deterioration in quality of goods or services. Id. at 1489. Such analysis is difficult and often requires quantitative analysis that is outside the

capacity of most judges and jurors.  Perhaps, due to this, courts typically allow proof of

defendant's market power to act as a proxy for evidence of detrimental, anticompetitive effects.

See. FTC v. Ind. Fed. of Dentists, 476 U.S. 447, 460-61 (noting that market power is a "surrogate

for detrimental effects.")

   By way of contrast, certain actions "presumed to unreasonably restrain

competition" are analyzed as per se illegal "without elaborate inquiry as to the precise harm [they

have] caused or the business excuse for [their] use" In re Flat Glass Antitrust Litig., 385 F.3d

350, 356 (3d Cir. 2004) (quoting Rossi, 156 F.3d at 461.)  Over the past several decades, the

Supreme Court has narrowed the applicability of per se analysis expressing a reluctance to apply

this standard "in the context of business relationships where the economic impact of certain

practices is not immediately obvious."  State Oil Co. v. Khan, 522 U.S. 3, 10 (1997); see also

Leegin Creative Leather Prod., Inc., v. PSKS, Inc.. 125 S. Ct. 2705 (2007) (noting that the

Supreme Court had been narrowing the applicability of per se analysis, and holding that such

analysis was inappropriate in cases of vertical restraints.)  Horizontal price-fixing[5]—i.e., where

competitors at the same market level agree to fix or control the prices they will charge for

goods—is subject to per se analysis.  See Flat Glass, 385 F.3d at 356.

   Courts have increasingly applied an intermediate standard—the "quick

look"—when per se analysis is inappropriate but "no elaborate industry analysis is required to

demonstrate the anticompetitive character" of an alleged antitrust violation.  NCAA v. Board of

Regents of the Univ. of Okla., 468 U.S. 85, 109 (1984.)  Such an approach "may be applied only

---

5. A conspiracy is horizontal "when a number of competitor firms agree with each other and at least one of their common suppliers or manufacturers to eliminate their price-cutting competition by cutting his access to supplies." Rossi v. Standard Roofing, Inc., 156 F.3d 452, 465 (3d Cir. 1998).

when an observer with even a rudimentary understanding of economics could conclude that the

arrangement in question would have an anticompetitive effect on customers and markets."

Gordon v. Lewistown Hosp., 423 F.3d 184, 210 (3d Cir. 2005) (quoting Cal. Dental Ass'n v.

FTC, 526 U.S. 756, 770 (1999)).

        The Court need not rely on any of these standards as the case is governed by the

summary judgment standard as there is insufficient evidence to support RDK's antitrust claims.

### 1.    The Alleged Unlawful Agreement Between Mack and Its Dealers

        RDK asserts that Mack and its dealers improperly agreed that Mack would deny

sales assistance on chassis being sold, by Mack's dealers, to RDK.  Despite its assertions, RDK

has provided no evidence supporting its claim of a direct, vertical conspiracy.  RDK has

purchased Mack chassis from several Mack dealers, most commonly Dallas Mack, and resold

them as ready trucks.  (Pls.' Resp. to Mot. Summ. J. 11 & Ex. 5, Arturo Lasanta Dep. ("Lasanta

Dep.") 221:2-14, June 20, 2007.)  Mack dealers selling to RDK were granted sales assistance for

these sales, and from 1998 to 2002 RDK was among Mack's 50 biggest customers.[6]  (Pls.' Resp.

to Mot. Summ. J. 11; Ex. 2, Flaherty Dep. 14:1-7; Ex. 26, Top Mack Retail Sales 1998 - 2002.)

        RDK claims that its success upset some Mack dealers, most notably the Nextran

Group (Nextran).  Like RDK, Nextran is based in Florida.  (Pls.' Resp. Mot. Summ. J. 12.)

Given their size and geographic overlap, Nextran and RDK competed for sales.  Not content to

---

6.  It is important to place these sales numbers in context as RDK notes that it "was one of Mack's [b]iggest [c]ustomers."  (Pls.' Resp. Mot. Summ. J. 11.)  From 1998-2002, Mack's fifty biggest customers combined purchased 48,082 Mack trucks.  Ryder was Mack's largest customer buying 9,810 trucks, and Waste Management was second buying 6,078 trucks. Mack's twenty-five largest customers bought 40,915 trucks, and the next twenty-five largest dealers bought a customer total of 7,167 trucks.  RDK purchased 265 Mack trucks, or .55%, of all Mack chassis sold during this time.  (Pls.' Resp. to Mot. Summ. J. Ex. 26, Top Mack Retail Sales 1998- 2002.)

compete, RDK asserts that Nextran opposed RDK's sale of new Mack trucks and voiced this opposition at Council meetings, as did a number of other Mack dealers.  (Pls.' Resp. Mot. Summ. J. 12-14; Ex. 29, Pritchett Dep. 10:22-23; Ex. 2, Flaherty Dep. 34:3-15; & Ex. 30, Maddox Dep. 27:2-10.)  RDK asserts that Steven Ralich, a Mack dealer, admitted at his deposition that there was a "consensus" among Mack dealers to deny sales assistance on chassis being sold to RDK. (Id. at 48 citing Ex. 3, Steven Ralich Dep. ("Ralich Dep.") 89:12-17, Nov. 20, 2007).)

RDK claims that dealer complaints had the intended effect, as Mack acquiesced and agreed with their dealers—who, by virtue of their size, exercised undue influence over Mack—to deny sales assistance for sales to RDK.[7]  When RDK's principal and owner, Richard Kemner, confronted Mack about this policy change, he was reportedly told that it would be "cheaper and easier to fight and pay you than it would be for us to take and fight our Dealer Council."  (Pls.' Resp. to Mot. Summ. J. 17; Ex. 9, Kemner Dep. 38:1-6.)  As a result, in 2001, Mack began denying assistance on sales to RDK.  (Pls.' Resp. to Mot. Summ. J. 12; Ex. 29, Lasanta Dep. 124:3-12.)

The "presence of concerted action or an agreement is an essential element of a section 1 claim." Rossi v. Standard Roofing, Inc., 156 F.3d 452, 465 (3d Cir. 1998).  The existence of an agreement is "the very essence of a section 1 claim."  Alvord-Polk, Inc. v. Schumacher & Co., 37 F.3d 996, 999 (3d Cir. 1994).  Evidence of concerted action can be either direct or circumstantial with the latter being more common.  William C. Holmes, ANTITRUST LAW HANDBOOK § 2:4 (2008).  Where a plaintiff solely relies on circumstantial evidence,

---

7.  RDK repeatedly notes that Mack denied sales assistance to RDK.  Technically, while the effect is much the same, this statement is factually incorrect.  Mack does not provide sales assistance to customers.  Sales assistance is pricing offered assistance to Mack dealers, which is passed on, in the form of a reduced price, to customers, such as RDK.

inferences from that evidence tends to "exclude the possibility that the alleged conspirators acted independently." <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 588 (1986) (<u>citing</u> <u>Monsanto Co. v. Spray-Rite Serv. Corp.</u>, 465 U.S. 752, 764 (1984)).

### a.     It is Not Clear That RDK is the Eligible for Protection for Under the Relevant Case Law

In its Response to Defendants' Motion for Summary Judgment, RDK cites, as support for its claim, several cases involving manufacturers and dealers who sought to improperly undermine price cutting dealers.[8]  The hallmark of these suits is that a group of dealers complain about another price-cutting dealer in the hope that the manufacturer either will refrain from dealing with the price-cutter or deny the potential price-cutter a franchise.

---

8.  RDK cites the following manufacturer-dealer cases to support its argument against Mack and the Mack Dealers: <u>Alvord-Polk, Inc. v. F. Schumacher</u>, 37 F.3d 996 (3d Cir. 1994); <u>Big Apple BMW, Inc. v. BMW of North America, Inc.</u>, 974 F.2d 1358 (3d Cir. 1992); and <u>Arnold Pontiac-GMC, Inc. v. General Motors Corp.</u>, 786 F.2d 564 (3d Cir. 1986).

     These manufacturer-dealer cases involved the Third Circuit's reversal of district court decisions granting summary judgment to the manufacturer.  RDK, in citing them, distinguishes them from a "facially distinguishable" case, cited by Defendants, as it involved a buyers' co-operative.  (Pls.' Sur-Reply Br. 8, n.3 (citing <u>NW Wholesale Stationers, Inc. v. Pac. Stationery and Printing Co.</u>, 472 U.S. 284 (1985).)  This Court finds these manufacturer-dealer cases facially distinguishable from the present matter.  By way of summary, in <u>Arnold Pontiac-GMC</u>, appellant asserted that its efforts to acquire a Buick franchise were frustrated by the opposition of local Buick dealers.  Similarly <u>Big Apple BMW</u>, involved a suit by an automobile dealer who had entered into negotiations with BMW to buy three BMW franchises.  The sale fell through, and appellant filed suit alleging that BMW's reasons for refusing to sell the dealerships were pretextual and that dealer complaints were the real reason why the offer was rescinded.  Finally, <u>Alvord-Polk, Inc.</u>, involved a suit brought by wallpaper dealers selling wallpaper over the phone.  These "phone sales" dealers alleged that "bricks and mortar" dealers, belonging to the same wallpaper dealer's association, conspired to force wallpaper manufacturers to cease dealing with the phone dealers.

     Factually, <u>Big Apple BMW</u> and <u>Arnold Pontiac-GMC</u> are distinguishable from the present case as both involved dealer efforts to bar individuals from joining their dealer network.  By way of comparison, RDK has never sought to become a Mack dealer.  In fact, it has specifically avoided becoming an authorized dealer of any truck brand.  <u>Alvord-Polk</u>, is distinguishable too as it involved a dispute by dealers, who were part of the same trade association, and were marketing the same product.  Here, RDK is neither part of the Mack dealer network, nor is it marketing the exact same product, both–technically as RDK labels all its trucks as "used"–and literally–as RDK only provides ready trucks and not the custom chassis sold by Mack dealers.

     As a legal matter, while all three of these cases are good law, this Court believes that their holdings must be analyzed in light of the Supreme Court's recent decision in <u>Leegin</u> analyzing the quantum of evidence needed in manufacturer-dealer cases, which this Court addresses in the body of its analysis.

It is unclear that these dealer-manufacturer cases are applicable to the present suit as RDK has never been nor sought to be an authorized Mack dealer.  RDK purchases Mack chassis from Mack dealers, installs bodies upon these chassis, and resells them.[9]  By way of analogy, RDK is no more a Mack dealer than is the individual—who after buying a Rolex from an authorized jeweler, proceeds to then sell that unused watch from the back of his car—a Rolex dealer.  Despite its self-professed fondness for Mack's product, RDK has never sought to become an authorized Mack dealer.  Instead, RDK directly competes with the business model established by Mack and its dealers.  As a result, RDK cannot avail itself of this Circuit's case law protecting price-cutting dealers.[10]  To assert a federal antitrust claim, the plaintiff must have suffered an antitrust injury, "of the type the antitrust laws were intended to prevent and that flows from that which makes the defendant's acts unlawful."  Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977).  Plaintiff has not asserted such a claim.  This Court fails to see how RDK has standing to assert this particular antitrust claim against Mack and its dealers.

### b.    Analysis of Dealer Complaint Suits

Despite this Court's belief that RDK does not have standing for its claim against Mack and its dealers, this Court, out of an abundance of caution, will examine the merits of RDK's claim of a vertical, manufacturer-dealer conspiracy.  The Supreme Court's analysis of dealer complaint suits has been clear: a manufacturer's receipt of dealer complaints about the

---

9.  To comply with Florida law, RDK technically does not sell new trucks, reclassifying these unused trucks it buys as "used."  (Defs.' Mot. Summ. J., Ex. 19, Scott Dep. 26:15-27:22.)

10.  When analyzing restraints among vendors, the Supreme Court in Leegin noted that some restraints on intrabrand competition were permissible to the extent that these restraints promoted interbrand competition.  See Leegin, 127 S. Ct. at 2708.  Leegin is instructive since RDK, unlike authorized dealers, plays no role in Mack's ability to compete with other brands.

price cutting activities of another dealer is not, absent more evidence, sufficient to establish the existence of a manufacturer-dealer conspiracy. See Monsanto Co., 465 U.S. 752. In Monsanto, the Supreme Court held that antitrust plaintiffs alleging a Section 1 price-fixing conspiracy must present evidence tending to exclude the possibility that a manufacturer and its distributors acted in an independent manner as the mere inference of conspiracy could undermine procompetitive actions. Id. at 764. Dealer complaints and responses are not sufficient to support a conspiracy claim as "proof of opportunity alone is insufficient to sustain an inference of conspiracy." Cosmetic Gallery, Inc. v. Schoeneman Corp., 495 F.3d 46, 53 (3d Cir. 2007). The Supreme Court and this Circuit have been clear: manufacturers may take dealer concerns into account when setting pricing.

The Supreme Court in Leegin noted that "[m]inimum resale price maintenance can stimulate interbrand competition . . . by reducing intrabrand competition among retailers selling the same brand. This is important because the antitrust laws' primary purpose . . . is to protect interbrand competition." Leegin, 127 S. Ct. at 2708 (quoting Khan, 522 U.S. at 15.) But the Court also noted that vertical restraints can have anticompetitive effects. Id. at 2717. Specifically, "[r]esale price maintenance, furthermore, can be abused by a powerful manufacturer or retailer. A dominant retailer, for example, might request resale price maintenance to forestall innovation in distribution that decreases costs." Id.

Mack argues that it was concerned that RDK free-rider on the investments made by Mack and its authorized dealers. (Defs.' Reply Br. 13.) Such free-riding takes two primary forms— free-riding on promotion and free-riding on maintenance/service. Mack dealers are required to promote the Mack brand. RDK has no such obligation. RDK's promotional budget

14

is extensive, but that budget promotes RDK and not any particular truck brand. (See Pls.' Resp.

Mot. Summ. J. 6 (stating that "RDK is a National Price-Advertiser," and discussing its marketing

approach.).) Mack's actions are consistent with the Supreme Court's statement that setting the

resale price provides positive pro-competitive benefits including "services or promotional efforts

that aid the manufacturer's position as against rival manufacturers.  Resale price maintenance

may also give consumers more options to choose among low-price, low-service brands;

high-price, high-service brands; and brands falling in between." Leegin, 127 S. Ct. at 2708.

Promotion of its product and the provision of high-quality service, are precisely the reasons

offered by Mack for its decision to unilaterally rescind sales assistance to chassis destined to

RDK.

    Second, Mack claims that RDK free-rides on its dealer's investments in post-sales

service.  With its nation-wide network, Mack can have trucks repaired at dealers nation wide.  By

contrast, RDK's only repair facility is in Tampa, Florida.  When asked what he would do if one

of his customers, who purchased a Class 8 Mack truck broke down in Texas and called him,

RDK's Kemner replied "[d]epends where it's at in Texas.  I would take and call into a Mack

hotline and see if I can get it repaired, and see if the customer needs another truck to get him up

and going."  (Defs.' Reply Br. 15 (quoting Defs.' Mot. Summ. J. Ex. 22, Richard Kemner Dep.

("Kemner Dep.") 22:8-14, Jul. 24, 2007).)[11]

---

11.   Underscoring the value of dealer investments, RDK's Municipal Sales Manager, David Lance, at his deposition, was asked if RDK's competitors, who were not authorized EZ-Pack Dealers, should receive the same pricing from EZ-Pack as does RDK, an authorized dealer.  Mr. Lance was asked, based on his understanding of the term "fair," if he believed "it would be fair for E-Z Pack to give the same price to Trucks and Parts for Tampa [not an authorized dealer] for their equipment they give to RDK?"  He responded, "I don't think it would be fair because of our investments."  (Defs.' Reply Br., Ex. 5, David Lance Dep. 78:5-15, Jul. 11, 2007.)

RDK asserts that Mack's stated rationale for rescinding sales assistance was pretextual and after-the-fact. This Circuit, faced with sufficient evidence, has routinely rejected pretextual explanations for corporate behavior. In <u>Big Apple BMW</u>, 974 F.2d at 1380, the court examined claims of vertical collusion finding that BMW's explanations for denying appellant's dealership bid were pretextual and provided an insufficient basis for summary judgment dismissal. The court noted the existence of evidence, in the form of letters, and testimony suggesting that BMW's proffered reasons were simply after-the-fact justifications. (<u>Id.</u>) Similarly, in <u>InterVest, Inc. v. Bloomberg, L.P.</u>, 340 F.3d 144, 167 (3d Cir. 2003), the Third Circuit again examined an antitrust suit where appellant asserted that the business reasons offered by appellee were pretextual. Unlike in <u>Big Apple</u>, however, the court affirmed the district court's grant of summary judgment. Appellant's conspiracy claim largely relied upon appellee's alleged response to dealer complaints absent any evidence of an agreement. <u>Id.</u> at 166. Other than note the existence of such complaints, appellant provided neither evidence of dealer threats nor direct evidence of a conspiracy. The court noted that the evidence of concerted action "is at best ambiguous and does not tend [ ] to exclude the possibility" that the parties acted independently. <u>Id.</u> (citing <u>Monsanto</u>, 465 U.S. at 764.)

As in <u>Intervest</u>, RDK fails to provide evidence that tends to exclude the possibility that the parties acted independently. It is clear that numerous Mack dealers did not want Mack granting sales assistance for sales to RDK. These dealers voiced their opposition at Council meetings. It is equally clear that other dealers, belonging to the Council, did not support this decision and wanted Mack to continue providing sales assistance on sales to RDK. (Defs.' Reply Br. 9, Ex. 2, Pritchett Dep. 12:2-12:15.) RDK argues that Mack dealer, Steven Ralich, admitted

16

that there was a "consensus" to deny RDK the benefit of sales assistance.  (Pls.' Resp. Mot.

Summ. J. 48.)  Such is not the case.  Ralich's comments, when read in context, actually

underscore—the exact opposite conclusion—the absence of any dealer agreement.  When asked

if he knew of specific Mack dealers who opposed the provision of sales assistance on sales to

RDK Ralich stated:

> A.  And the only dealers that I'm aware of that feel
> differently are those that provide a lot of new Mack
> trucks.  You know, you could be looking at
> hundreds of units here where they are the actual
> providers of those units to those independent
> dealers.
>
> Q.  So in you – in your opinion, is there a consensus
> among Mack dealers **who are not selling new
> Mack chassis to RDK** that companies like RDK
> should not be able to get extra sales assistance from Mack on new Mack chassis?
>
> A.  I would say that's a fair characterization, yes.

(Defs.' Reply Br. 6 (citing Ralich Dep. 89:7-18) (emphasis added).)  There is no evidence that

Mack dealers reached an agreement on how Mack should deal with RDK, much less expressed

that consensus, to Mack.

      This lack of evidence stands in contrast to the situation in the related case of

Toledo Mack v. Mack Trucks, Inc., 530 F.3d 204 (3d. Cir. 2008).  In Toledo Mack, the Third

Circuit found summary judgment inappropriate given direct evidence suggesting that Mack and

its dealers actively conspired to restrict assistance to other Mack dealers.  Id. at 222.  In Toledo

Mack, the appellant's direct evidence included: (1) recordings and conversations referring to an

unwritten "gentleman's" agreement between Mack and its dealers; (2) an official policy barring

dealers sales outside their AOR; and (3) evidence that Mack and its dealers produced Bulletin

38-89 eliminating "sales assistance to dealers on sales outside their AORs."  Id.  The Third

Circuit noted that Mack and its dealers "met, discussed, and unanimously approved Bulletin 38-

39 before Mack issued it."  Id. at 223.

        Toledo Mack's direct evidence underscores the paucity of the circumstantial

evidence in the present case.  In the present case, there is no evidence of: (1) any agreement

among dealers much less recording or conversations indicating the existence of a "gentlemen's

agreement;" or (2) a written Bulletin.  RDK only suggests that some dealers were upset that other

dealers obtained sales assistance when selling to RDK.  There is no evidence that Mack and its

dealers "met, discussed, and unanimously approved" of any plan.  RDK fails to provide evidence

sufficient to support its claim that Mack's stated reasons for its policy barring sales assistance on

sale to third-party vendors were pretextual.  Given this, RDK has failed to carry its burden of

proving a conspiracy between Mack and its dealers.  Accordingly, this Court determines that

summary judgment, with regard to RDK's claim of vertical conspiracy, is appropriate.

> **2.      The Alleged Conspiracy Between Mack and The Body
> Builders, McNeilus and Heil, to Refuse to Sell Mack Ready
> Trucks to RDK**

        RDK next alleges that Mack conspired with the Body Builders, McNeilus and

Heil, to form a three-way agreement whereby the Body Builders would refuse to sell discounted

Mack chassis to RDK.  In its Response to Defendants' Motion for Summary Judgment, RDK

provides its evidence about this conspiracy as follows.

> **a.      McNeilus**

        RDK notes that, in 2002, Joe Favia, Mack's National Accounts Manager, wrote to

Tim Trom, McNeilus's Director of Purchasing, stating that McNeilus agreed to not sell "through

a third party to retail." (Pls.' Resp. Mot. Summ. J. 20 (citing Ex. 33, Favia Sept. 5, 2002 Letter to Trom).) Subsequently, in Spring 2003, Mack held a meeting with a number of body builders. (Id.) McNeilus and Heil attended this meeting which specifically discussed McNeilus's sales to RDK. (Id. at 21 (citing Ex. 34, Body Builder Meeting Minutes).) Sales to third party distributors remained an important topic for Mack as its staff continued to discuss it with McNeilus.

RDK cites internal McNeilus emails as proof that Heil was involved in the Mack-McNeilus agreement. One email stated that "they are going to cut RDK off from getting trucks as well." (Id. at 22 (quoting Ex. 37, Trom June 4, 2003 email).) RDK posits that this email shows that McNeilus understood that it would not lose business to Heil if it ceased dealing with RDK. To further support it allegations of conspiracy, RDK notes that McNeilus's 2003 price quotes became "ridiculous." (Id. at 23.)

RDK notes that later in 2004, Mack executives and Mack dealers met with McNeilus executives, and as a result of that meeting, Mack executives believed that Mack and McNeilus had reached an agreement about the sale of discounted trucks to RDK. (Id. at 24 (citing Ex. 2, Kevin M Flaherty Dep. ("Flaherty Dep.") 62:18-67:15, 68:3-25, Aug. 14, 2007).)

### b.    Heil

After McNeilus raised the prices quoted to RDK, RDK increasingly turned to Heil as a source for discounted Mack trucks. (Id. at 25.) After Heil began to work with RDK more, some Heil executives met with Mack executives in Allentown, Pennsylvania where Mack asked Heil to cease its sales to RDK. (Id.) Heil followed-up with Mack asking it to "confirm with letter on your standing with Trucks & Part + RDK." (Id. at 25-26 (quoting Ex. 40, Wennerstrom Feb. 20, 2004 email).)

19

Mack never responded in writing, and instead Mack's Flaherty called Heil's Rogers about sales to RDK. Rogers testified that Mack raised this matter with Heil because of Mack dealers' competition with RDK. (Id. (citing Rogers Dep. 92:13-93:10).) Shortly thereafter, RDK claims that Heil stopped quoting and selling Mack chassis to them. Given this, RDK's Kemner contacted Kevin Flaherty of Mack to determine why RDK could no longer buy Mack chassis from Heil. (Id. at 26-27.) Kemner testified that Flaherty told him that Mack's decision was based upon dealer pressure, specifically from Nextran. (Id. at 27 (quoting Ex. 9, Richard Kemner Dep. ("Kemner Dep.") 8:2-9:11, Jan. 9, 2006.) Flaherty later told Kemner that "it would be cheaper and easier to fight and pay [RDK] than it would be for [Mack] to take and fight its dealer council." (Pls.' Resp. Mot. Summ. J. 27 (quoting Kemner Dep. 38:3-6).)

        **c.**      **Evidence of a Horizontal Agreement Between McNeilus and Heil.**

As initially presented in their Response, RDK's evidence suggests the existence of two vertical agreements: one between Mack and McNeilus and another between Mack and Heil. RDK provides no evidence, direct or circumstantial, suggesting Heil and McNeilus communicated with one another in furtherance of a conspiracy. Instead, RDK asserts that (1) it is clear that McNeilus and Heil were competitors who, absent a horizontal agreement, would not cease competing for RDK's business, and (2) Mack's Flaherty testified that, in speaking with Heil, he told it that McNeilus had agreed to Mack's request that it limited sales to RDK, just as Mack was asking Heil to do. (Id. at 28-29 (citing Flaherty Dep. 76;17-77:9).) To prove a claim of horizontal conspiracy, RDK asserts that it need not show a direct agreement between McNeilus and Heil. (Id. at 53.) Rather, a jury could conclude that "Heil and McNeilus acted in

20

concert and that this concerted action was orchestrated by Mack." (Id.)  RDK asserts that its has

provided circumstantial evidence, like that considered by the Seventh Circuit in Toys "R" Us,

Inc. V. FTC, where the court found that toy manufacturers had improperly conspired, under the

guidance and direction of Toys "R" Us, to cease distributing toys through discount retailers.  221

F.3d 928 (7th Cir. 2000)  The court found that Toys "R" Us and the toy makers entered into a

series of vertical agreements that, taken together, constituted a horizontal agreement as it would

not be in any toy maker's interests to cease selling to discount dealers absent an agreement, that

"I'll stop if they stop."  Id. at 932.

       RDK posits that an incident at the 2004 Waste Expo reveals the existence of a

horizontal agreement between McNeilus and Heil.  RDK went to Waste Expo in the hope of

securing a large order of Mack trucks from McNeilus or Heil  (Pls.' Resp. Mot. Summ. J. 30.)

To that end, RDK's Kemner told a McNeilus executive that he was planning to place a bid with

Heil for up to one hundred trucks.  Instead, a McNeilus salesman negotiated a sale between RDK

and McNeilus.  Later, when speaking to Heil's Jimmy Rogers, Kemner told him about

McNeilus's agreement to sell Mack trucks to RDK.  (Id. at 30-31.)  Rogers allegedly pronounced

this a "double standard," and marched off toward the Mack Truck booth.  (Id. at 31.)  RDK

suggests that the "plain implication of this utterance was that McNeilus was not abiding by the

across the board agreement to cut off RDK, as Mack had previously assured him was the case."

(Id.) (internal quotations omitted.)

       After the 2004 Waste Expo, McNeilus wrote to RDK memorializing the Waste

Expo order and providing a quote for twenty-four trucks.  (Id. (citing Ex. 42, Duffey May 25,

2004 letter to Kemner).)  The letter closed noting that "[w]e appreciate your business, Richard,

and we look forward to a renewed relationship." (Id.)  RDK received five of these trucks, but

shortly thereafter, McNeilus contacted RDK, and cancelled its contract.  RDK suggests that:

> Rogers carried through on this threat, made to
> Kemner at the Waste Expo, that he would get the
> 'double standard' with respect to Heil and McNeilus
> and RDK 'straightened out,' that Mack reacted by
> approaching McNeilus to ensure its compliance
> with the agreement to cut off RDK's access to
> discounted Mack Truck and that McNeilus did just
> that.

(Id. at 31-31.)

On June 9, 2004, Mack dealer Bob Nuss wrote to Mack stating that "McNeilus

feels that if RDK is buying complete packages of Mack Trucks they would like their share if this

is permitted." (Id., Ex. 47, Nuss June 9, 2004 email.)  RDK argues that this email shows that

McNeilus would agree to deny RDK Mack trucks only if Heil still agreed to do likewise. (Id. at

33.)  Shortly thereafter, McNeilus told RDK that it could not provide the previously quoted price

as "Mack has problems with RDK." (Id. (quoting Ex. 42, Kemner June 15, 2004 email

memorandum).)

RDK suggests that the horizontal conspiracy continued as Heil stopped selling

discounted chassis to RDK. (Id. at 34.)  Following the 2004 Waste Expo, McNeilus's price

quotes increased dramatically. (Id. at 35.)  And before it stopped quoting RDK altogether,

McNeilus delayed a price quote for so long that RDK lost a potential sale to Metro Disposal.

### 3.    RDK Fails to Show The Existence of Three-Way Conspiracy

"To survive a motion for summary judgment . . . [an antitrust] plaintiff seeking

damages for a violation of § 1 [of the Sherman Act] must present evidence that tends to exclude

the possibility" that the alleged conspirators acted independently.  Matsushita, 475 U.S. at 588

(internal quotation marks omitted).  The Supreme Court has been clear that fact finders should

not be permitted "to infer conspiracies when such inferences are implausible, because the effect

of such practices is often to deter procompetitive conduct."  Id. at 593 (citing Monsanto, 465 U.S.

at 762-64).  In Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007), the Supreme Court summarized

the current requirements for antitrust plaintiffs:

> An antitrust conspiracy plaintiff with evidence
> showing nothing beyond parallel conduct is not
> entitled to a directed verdict, see [ Theatre
> Enterprises, Inc. v. Paramount Film Distributing
> Corp., 346 U.S. 537, 74 S.Ct. 257, 98 L.Ed. 273
> (1954) ]; proof of a § 1 conspiracy must include
> evidence tending to exclude the possibility of
> independent action, see [Monsanto]; and at the
> summary judgment stage a § 1 plaintiff's offer of
> conspiracy evidence must tend to rule out the
> possibility that the defendants were acting
> independently, see [Matsushita].

127 S.Ct. at 1964 (internal citations omitted).  The Third Circuit has noted that there often exists

a "fine line between legitimate business practices and unlawful concerted action, and direct

evidence-the smoking gun-of illegal conspiracy may not be available.  Thus it is essential to

consider all of the evidence proffered to determine whether it is sufficient to withstand a motion

for summary judgment."  Cosmetic Gallery, 495 F.3d at 52.  "Direct evidence in a Section 1

conspiracy must be evidence that is explicit and requires no inferences to establish the

proposition or conclusion being asserted."  In re Baby Food Antitrust Litig., 166 F.3d 112, 118

(3d Cir. 1999).

All of the evidence RDK presents is circumstantial.  RDK claims that it "has adduced direct evidence in the form of admissions from Mack Senior Vice President Kevin Flaherty and National Accounts Manager Joseph Favia" as to the existence of agreements whereby the Body Builders agreed to deny RDK Mack chassis at a discount.  (Pls.' Resp. Mot. Summ. J. 52 (citing Flaherty Dep. 62-65; Ex. 20, Joseph E. Favia Toledo Mack Dep. ("Favia Dep.") 228-29, Nov. 12, 2003).).)[12]  For this evidence to stand as direct proof of conspiracy, a reasonable juror would have to determine that these statements constituted proof of an illegal agreement.  These deposition statements do not provide this level of clarity.  In fact, the cited portion of the Flaherty deposition makes no reference to Heil at all.  Rather, the transcript recounts Flaherty's unsuccessful efforts to convince McNeilus not to sell to RDK.  (Id., Ex. 2, Flaherty Dep. 62-65.)  The Favia deposition is even more off-base as the cited portion in no way mentions Heil or RDK.  (Id., Favia Dep. 228-229.)  These statements fail to provide direct evidence of any Mack–McNeilus agreement much less a conspiracy between Mack, McNeilus, and Heil.

Accordingly, RDK's  "direct" evidence will be grouped with its proffered circumstantial evidence.  RDK, in its Response, presents the following as circumstantial evidence of a three-way conspiracy:

> (1) 2004 Waste Expo: At the 2004 Waste Expo, Jimmy Rogers of Heil, upon learning from RDK that McNeilus was selling Mack trucks to RDK pronounced this a "double standard," and marched off toward the Mack Truck booth.  (Id. at 52.)

---

12.  RDK tacitly acknowledges that the Favia Deposition is not direct evidence.  RDK's Sur-Reply asserts only that "[t]he testimony of Mack Executive, Kevin Flaherty, is direct evidence of a three-way agreement."  (Pls.' Sur-Reply 1.)  By exclusion, it admits that Mr. Favia's statement fail as direct evidence.

Shortly thereafter, McNeilus contacted RDK, and cancelled its contract.

(2) June 9, 2004 Bob Nuss email: In this email, Bob Nuss, a Mack dealer, wrote that "McNeilus feels that if RDK is buying complete packages of Mack Trucks they would like their share if this is permitted."  (Id, at 53 (citing Ex. 47, Nuss June 9, 2004 email).)

(3) June 4, 2003 Tim Trom email: RDK asserts that this internal McNeilus email reveals that, as early as June of 2003, when Mack had approached McNeilus to ask it to eliminate sales of discounted trucks to RDK, and told McNeilus that Heil had also agreed to cut off RDK.  (Id. at 30 (citing Ex. 37, Trom June 4, 2003 email).)

(4) Flaherty-Rogers call: RDK cites to Mr. Flaherty's deposition testimony where he recounts how Jimmy Rogers, called him to see if the refusal to deal with RDK was "across the board."  (Id. at 29 (citing, Flaherty Dep. 76-77).)

(5) Midwest Power: Unable to obtain Mack trucks from Heil or McNeilus, at competitive prices, RDK started purchasing trucks from Midwest Power, a third-party distributor.  (Id. at 36.)

(6) McNeilus' claim that it ceased selling to RDK because of RDK's lawsuit is pretext.

    Because all of the evidence of conspiracy is circumstantial, the limitations on

permissible inferences enunciated in Matsushita apply.  475 U.S. at 586.  Accordingly, the Court

must first assess the plausibility of the plaintiff's conspiracy theory based on the economic

rationality of such a conspiracy and any rational motives the defendants may have had to form an

anticompetitive agreement.  If the Court finds that theory implausible, the plaintiff's

circumstantial evidence must strongly suggest the existence of such an agreement in order to

provide an inference that can survive summary judgment. Toledo Mack, 530 F.3d at 219. Whether a claim is plausible relates to the factual context of the claim. Rossi, 156 F.3d at 466. Regardless of the theory's plausibility, the law requires the plaintiff to put forth evidence tending to exclude the possibility of unilateral action. Toledo Mack, 530 F.3d at 219-220. Defendants rebut RDK's circumstantial evidence by both offering their own factual explanations and arguing that this evidence only indicates permitted parallel action.

### A.     Circumstantial Evidence

Defendants provide their own counter-narrative of RDK's circumstantial evidence: the June 9, 2004 Bob Nuss email; June 4, 2003 Tim Trom email; Flaherty-Rogers call; and the 2004 Waste Expo.

**Nuss email:** In this email, RDK notes that Bob Nuss, a Mack dealer, wrote to Mack's Kevin Flaherty stating that "McNeilus feels that if RDK is buying complete packages of Mack Trucks they would like their share if this is permitted." (Pls.' Resp. to Mot. Summ. J. 53 (quoting Ex. 47, Nuss June 9, 2004 email).) RDK notes that this "creates a clear issue of fact as to whether Mack was coordinating a horizontal combination between McNeilus and Heil not to sell to RDK at preferred prices." (Id.) In response, Defendants aver that RDK's analysis lack any basis as this email makes no mention of Heil, "much less Heil's sale policies or prices as to RDK." (Defs.' Reply Br. 29.) Further, Defendants argue that even an effort to ensure an uniform policy does not show the existence of any conspiracy. See Pepsico, Inc. v. The Coca Cola Co., 315 F.3d 101 (2d Cir. 2002) (holding that Coca-Cola's use of loyalty agreements among distributors may have resulted in conscious parallelism by distributors but was not sufficient evidence of a conspiracy.)

**Trom email:** RDK notes "an internal McNeilus email reveals that, as early as June of 2003, when Mack had approached McNeilus to ask it to eliminate sales of discounted trucks to RDK, Mack informed McNeilus that Heil had also agreed to cut off RDK."  (Pls.' Resp. Mot. Summ. J. 30 (citing Ex. 37, Trom June 4, 2003 email).)  Defendants, countering RDK's interpretation of the email, provides the email in its entirety:

> Jim,
>         On Monday, we need to sit down and talk about Mack.  They are having continued issues with our relationship of selling packages to Trucks-N-Parts.  I am not sure where we are going with this but it will be a problem.
>         I would like to explore some middle ground on the issue whereby we would control the invoicing of the actual package to the end customer. This is the only way I can see a way around this issue. In addition, they are going to cut RDK off from getting trucks as well.
>         Let's talk Monday.
> Tim.

(Defs.' Reply Br. 28-29.)  The email makes no reference to Heil.  Further, both parties interpret the "they" in this email as referring to Mack and not Heil. (See Pls.' Resp. Mot. Summ. J. 22.) ("they [Mack] are going to cut RDK off. . .".)  As such, looking at the entire email it is clear that RDK's interpretation lacks plausibility as (1) the email makes no reference to Heil, and (2) RDK has noted that it was Mack, and not Heil or McNeilus, that was going to "cut RDK off."

**Flaherty-Rogers Call:** RDK cites to Flaherty's deposition testimony where he recounts how Heil's Rogers called him to see if the refusal to deal with RDK was "across the board."  (Id. at 29 (citing Flaherty Dep. 76-77).)  RDK posits that Rogers was concerned about the nature of any agreement because Heil did not want to lose any sales to McNeilus.  Defendants

argue that this evidence shows, at most, that "Mack assured Heil that it sought uniform arrangements from both Heil and McNeilus.  But that is insufficient to show a conspiracy." (Defs.' Reply Br. 30.)  Citing Pepsico, Defendants argue that this is only evidence that Heil sought uniform treatment from Mack.  (Id.)  There is no evidence that Heil conditioned its actions on McNeilus's agreement nor is there any indication that McNeilus was aware of Heil's conversations with Mack.  (Id. at 31); see also (Defs.' Mot. Summ. J. 39.)

     **2004 Waste Expo:** RDK notes that at the 2004 Waste Expo, upon learning from RDK that McNeilus was planning to sell Mack trucks to RDK, Heil's Rogers, pronounced this a "double standard," and marched off toward the Mack Truck booth.  (Pls.' Resp. Mot. Summ. J. 30.)  Shortly thereafter, McNeilus contacted RDK, and cancelled its contract but not before McNeilus had provided RDK with five ready trucks.

     Defendants raise several matters in discussing this incident.  First, Plaintiff avers that after speaking with RDK, Mr. Rogers went to speak with Mack about the tentative RDK-McNeilus sale.  (Defs.' Reply Br. 31)  Defendants note that where Rogers went, after speaking with Kemner, is a matter of speculation.  No evidence has been provided showing that Rogers ever spoke with Mack about this sale.  Second, after the Waste Expo, McNeilus provided five ready trucks to RDK.  The delivery of these trucks runs counter to RDK's claim of a Mack-McNeilus-Heil conspiracy.

     Finally, McNeilus told RDK that it raised prices based on pressure from Mack, yet Defendants note that McNeilus made no mention of "Heil or of any alleged discussions between Mack and Heil."  (Id. at 32.)  Thus, while RDK sees such conversations as evidence analogous to Toys "R" Us-style conspiracy where McNeilus and Heil agree to stop selling to RDK only if the

28

other agreed to do so as well, Mack's response is succinct: "[t]his case is not <u>Toys "R" Us</u>."

(Defs.' Reply Br. 53.)  Mack asserts that RDK has provided no evidence that the McNeilus or

Heil conditioned their cessation of sales to RDK upon the other's agreement.[13]

## B.    Parallel Action

In <u>Petruzzi's IGA</u>, the Third Circuit stated that in order to establish a conspiracy

on the basis of "consciously parallel behavior, a plaintiff must show: (1) that the defendants'

behavior was parallel; (2) that the defendants were conscious of each other's conduct and that

this awareness was an element in their decision-making processes; and (3) certain 'plus factors'."

998 F.2d, 1224, 1242-43 (3d Cir. 1993).  Plus factors include: "(1) actions contrary to the

defendants' economic interests, and (2) a motivation to enter into such an agreement," each of

which must be present.  <u>Id.</u> at 1242.  The plus factors seek to address the Supreme Court's

concerns expressed in <u>Monsanto</u> and <u>Matsushita</u>, that the overly zealous application of antitrust

law can halt procompetitive behavior.  <u>See</u> Frank H. Easterbrook, <u>The Limits of Antitrust</u>, 63

T<span style="font-variant:small-caps">EXAS</span> L. R<span style="font-variant:small-caps">EV</span>. 1, 2 (1984) (Addressing the dangers of courts misapplying antitrust law now-

Judge Easterbrook, writing just before his appointment to the bench, noted that if a court in an

antitrust suit "errs by condemning a beneficial practice, the benefits may be lost for good.  Any

other firm that uses the condemned practice faces sanctions in the name of *stare decisis*, no

---

13.  Defendants' analyze RDK's "evidence" that McNeilus's price increase was part of conspiracy with Heil by noting that when McNeilus told RDK that it was increasing its price, no mention was made of Heil.  Defendants' analysis provides an instructive example as to this Court's proper posture toward evidence at the summary judgment stage.  Defendants claim that RDK makes an impermissible logical leap when it suggests that McNeilus's comments to RDK constitute evidence of a conspiracy involving Heil.  Defendants are correct.  But Defendants make a similarly fallacious leap when they interpret this same statement as evidence ruling out Heil's participation in a conspiracy with McNeilus.  By cabining the possible interpretations of ambiguous evidence, Plaintiff and Defendants seek to have this Court make credibility determinations regarding factual disputes.  At summary judgment, it is not the court's role to weigh disputed evidence and decide which is more probative, or to make credibility determinations.  <u>Boyle v. County of Allegheny, Pa.</u>, 139 F.3d 386, 393 (3d Cir. 1998) (citing <u>Petruzzi's IGA</u>, 998 F.2d at 1230.))

matter the benefits.  If the court errs by permitting a deleterious practice, though, the welfare loss decreases over time.  Monopoly is self-destructive.  Monopoly prices eventually attract entry.")

### a.    Heil

With regard to Heil, even if RDK can prove the first two Petruzzi's IGA factors, it cannot satisfy the plus factors.  RDK has failed to show that Heil's decision to cease direct sales to RDK was not in its economic best interest.

**Heil's Dealer Network:** Like Mack, Heil utilizes a dealer network to sell its product.  (Defs.' Mot. Summ. J. 22, Ex. 13, Brian Wennerstrom Dep. ("Wennerstrom Dep.") 141:19-142:9, Aug. 2, 2007.)  In 2001/2002, Heil lost its direct sales contract with Waste Management making it even more reliant upon its dealer network who directly competes with RDK.  (Defs.' Reply Br. 22; Ex. 8, Rogers Dep. 387:17-388:3.)  Understandably, Heil's dealers were bothered by Heil's direct sale of ready trucks to RDK.  The record is clear that Heil's dealer raised concerns about Heil's direct sales to RDK, and other third-party distributors, at Heil Distributor Council meetings.  (Id., Ex. 7, Ball Dep. 24:6-25:2.)  Jimmy Rogers stated that Heil ceased dealing directly with RDK because "we needed to figure out a strategy of how to take care of our dealers and at the same time do business with" RDK.  (Id.) (quoting Ex. 12, Rogers Dep. 79:1-79:11.)  Heil's dealers voiced their opposition to direct sales to RDK at the same time that (a) Mack asked Heil to stop quoting to RDK, and (b) Heil employees were told not to quote to RDK.  (Pls.' Resp. Mot. Summ. J. 34, Ex. 23, Rogers Dep. 102; Ex. 43, Ball Dep., 20:1-6.)  Mack's urging Heil to refrain from selling to RDK does not rebut Heil's stated reason for halting direct sales to RDK—the opposition of its dealer network to direct sales to RDK.  Absent more, Mack's request that Heil not quote to RDK does not prove the existence of a conspiracy.

Further supporting Heil's explanation for its decision is the testimony of RDK's Arturo Lasanta who noted that RDK could **always** purchase ready trucks from Heil's dealer network. (Defs.' Mot. Summ. J., Ex. 16, Lasanta Dep. 95:3-25, 319:22-320:2 (emphasis added).)

**Midwest Power:** As a middle ground, Heil asserts that it decided to sell to RDK indirectly through Midwest Power. (Defs.' Reply Br., Ex. 8, Rogers Dep. 387:17-388:3.) These indirect sales included Mack and non-Mack chassis. (Id. at 24, Ex. 9, A. Lasanta Dep. Vol I, 90:15-25; Defs.' Mot. Summ. J. Ex. 2, Epstein Report ¶ 52.) That Heil decided to sell through Midwest Power stands in contrast to RDK's assertion that Heil and McNeilus' refusal to deal directly with RDK forced it to work with Midwest Power. Instead, Heil provides that it was willing to deal with RDK, but only through a Heil dealer or an independent dealer like Midwest Power. RDK's Kemner noted that Heil was aware of the fact that RDK was buying from Midwest Power as he sent in warranty slips to Heil. (Defs.' Mot. Summ. J. 26.) "[T]o this very day" RDK continue to buy Heil trucks from Midwest Power. (Id.) Far from suggesting that Heil was refusing to work with RDK, this evidence suggests that Heil continues to deal with RDK providing it with both Mack and non-Mack chassis.

RDK argues that McNeilus and Heil

offer no explanation as to why RDK started purchasing Mack trucks through a middle-man (Midwest Power) if McNeilus and Heil was in fact willing to sell discounted chassis directly to RDK. Logic dictates that RDK would not have paid the extra costs associated with purchasing through Midwest Power *if RDK could have paid less for the same products by purchasing them directly from McNeilus or Heil*.

31

(Pls.' Resp. to Mot. Summ. J. 56 (emphasis in original).)  Such is not the case.  Taken together, the evidence provided by Heil suggests that it ceased direct sales to RDK in order to shore up its dealer network.  These steps included a decision to cease direct sales to RDK and instead work through Midwest Power to sell both Mack and non-Mack chassis.  Further, at all times, RDK admits that it was able to purchase trucks directly from Heil's dealer network.  This evidence provides a rational, parallel explanation for Heil's decision to cease direct sales to RDK—namely that it decided to bolster its "lifeblood," its dealers.  (Defs.' Reply Br., Ex. 8, Rogers Dep. 387:19.)

### b.     McNeilus

RDK claims that after the 2004 Waste Expo McNeilus provided a variety of "excuses" as to why its price quotes to RDK increased.  (Pls.' Resp. Mot. Summ. J. 35.)  In support of this proposition, RDK quotes an internal McNeilus email in which McNeilus's Vice President noted that they could quote Mack trucks to RDK but that "our pricing is not what it used to be."  (Id. (quoting Ex. 44 Timmerman email).)

In response, McNeilus argues that its decisions to: (1) increase its quoted prices; (2) delay providing quotes; and (3) ultimately refuse to quote to RDK were parallel to and independent of any actions taken by Heil or Mack.

**Increased Price Quotes to RDK:** McNeilus provides two explanations why its quoted prices for Mack trucks increased.  First, in the Fall of 2003 Mack imposed a "general and large" price increase on all Mack chassis.  (Defs.' Reply Br. 26; Ex. 12, Timothy Trom Dep. ("Trom Dep.") 213:16-215:25).)  As a result, McNeilus passed these costs onto its customers, and increased its quoted price.  (Id, (citing Trom Dep. 212:24-217:1.)  Second, McNeilus notes

32

that rising steel prices led Mack to impose a steel surcharge on chassis purchases.  (Id., Ex. 12, 214:13-21; Defs.' Mot. Summ. J., Ex. 2, Epstein Report ¶ 108 (citing Bureau of Labor Statistics indicating that from 2004-2006 steel prices rose roughly 40 percent).)  The results were foreseeable.  After the price of Mack's chassis increased, McNeilus began to sell fewer Mack chassis and more of Mack's competitors.  (Id., Ex. 12, Trom Dep. 212:24-217:1; Id., Ex. 13, Flaherty Dep. 227:8-231:21.)  These price increases were passed onto "all" of McNeilus's customers.  (Id.)  Far from indicating the existence of a conspiracy, these factors suggest the operation of a fluid and efficient market, sensitive to price increases.

**Delayed Quotes:** RDK asserts that McNeilus "intentionally delayed responses to quote requests from RDK for so long that RDK eventually lost the potential sale."  (Pls.' Resp. Mot. Summ. J. 35.)  Adding insult to injury, McNeilus never provided RDK with an explanation for this delay.  (Id.)  RDK referred to this lost deal as a "significant 25-truck deal with Metro Disposal that RDK failed to secure because Metro Disposal would only purchase Mack ready trucks with McNeilus bodies and RDK could not supply that product because of Defendants' conspiracy."  (Pls.' Resp. Mot. Summ. J. 38 (citing Lasanta Dep. 81 and 149).)

In response, McNeilus notes that RDK omitted "the full circumstances of this deal – and with good reason" as Metro Disposal was an established McNeilus sales account.  (Defs.' Reply Br. 27 n.9 (citing Lasanta Dep. 81:17-82:24, 84:5-84:14.)  In essence, RDK sought a quote from McNeilus in order to compete directly with McNeilus's own salesmen.  (Id. at 27. n.9.)  McNeilus's delay in providing a quote to RDK—so that RDK could compete with McNeilus's own sales force—is not evidence of conspiracy but rather commonsense.

33

**Refusal to Quote RDK:** RDK suggests that McNeilus's eventual refusal to provide quotes was pretextual as "McNeilus refused to sell discounted chassis to RDK and threatened to cut off Midwest Power *before McNeilus was joined in this lawsuit in April of 2005*." (Pls.' Resp. Mot. Summ. J. 56 (emphasis in original).) RDK hypothesizes that McNeilus ceased doing business with Midwest Power because:

> (1) McNeilus found out Midwest Power was selling to RDK before RDK sued McNeilus, (2) Lermon warned LeBlanc that RDK must keep its resale price high on McNeilus trucks high to avoid detection by Mack, and (3) when RDK did not ultimately set a minimum price on the trucks, McNeilus cut off Midwest Power for good.

(Id. at 56-57.) Notwithstanding RDK's assertions otherwise, its hypothetical conjecture fails to show the existence of a three-way, Mack-McNeilus-Heil, conspiracy. RDK posits that McNeilus asked Midwest Power to increase prices to avoid detection by Mack. Far from showing the existence of a Mack-McNeilus-Heil conspiracy, RDK appears to be suggesting the existence of a proposed McNeilus-Midwest Power conspiracy to deceive Mack. Supporting its claim that it ceased quoting RDK after being sued by them, McNeilus provides the following: (1) it was joined in this suit on April 11, 2005; and (2) it last quoted RDK on April 26, 2005. (Id. at 27 (citing Defs.' Mot. Summ. J. Ex. 31, McNeilus quote to RDK).)

Although RDK sought to conduct business with McNeilus and Heil, the Body Builder's refusal to deal directly with RDK does not suggest that their refusal was contrary to their economic self-interest. See Cosmetic Gallery, 495 F.3d at 52 (noting that appellee's refusal to deal with Cosmetic Gallery did not suggest that it was acting against its economic self-interest but rather pursuing a different retail model.) Heil has countered RDK's allegations by showing

34

that Heil has at no time refused to deal with RDK. Instead, Heil decided to change how it sold to RDK. Heil states that due to dealer complaints, and an increased reliance on its dealer network, necessitated by the loss of a major customer, Heil ceased direct sales to RDK. At all times, RDK could purchase trucks through Midwest Power or any Heil dealer. Further, Heil was aware of the fact that RDK dealt with Midwest Power as RDK sent warranty receipts directly to Heil.

Further, RDK's assertions regarding McNeilus and Midwest Power run directly contrary to the notion of any conspiracy between Mack, McNeilus, and Heil. Similarly, McNeilus's refusal to provide a price quote that would undercut itself is an example of business self-preservation not conspiracy. As for the timing of its last quote, the record indicates that McNeilus continued to quote RDK up until it was joined as a Defendant. Rather than provide evidence sufficient to sustain its burden, RDK has provided a series of loosely related conjectures and surmises that fail to support its allegation of a conspiracy.

For these reasons, the Court finds that Plaintiff has failed to provide evidence that "tends to exclude the possibility of independent action" by Heil and McNeilus. Accordingly, summary judgment dismissal of RDK's federal antitrust claim alleging a three-way conspiracy between Mack-McNeilus-Heil to deny RDK discount Mack trucks is appropriate.

3.    **RDK Fails to Show the Existence of a Three-Way Conspiracy Whereby McNeilus and Heil Refused to Sell to Established Mack Customers**

RDK also asserts that Mack, McNeilus, and Heil entered into a price-fixing agreement whereby the Body Builders agreed not to sell to established Mack customers. (Third Am. Compl. ¶¶ 35-36.) RDK alleges that this agreement harmed it in two ways. First, as RDK was an established Mack account it was harmed by the Body Builder's refusal to sell to them as it

lost the benefit of any potential price competition that would have arisen between Mack dealers and the Body Builders.  (Pls.' Resp. Mot. Summ. J. 63.)  Second, RDK claims that it was harmed as it did "not have any established Mack accounts and thus RDK did not enjoy any benefit from the Defendants' agreement not to compete over those accounts."[14]  (Id. at 63-64) (internal quotations omitted.)

Defendants' response is three-fold.  First, Defendants argue that RDK does not have standing to bring this claim as assuming that this conspiracy were true, it would benefit and not harm RDK as reducing the number of competitors would "unarguably be to RDK's benefit." (Defs.' Reply Br. 36.); (see also Defs.' Mot. Summ. J. 45-46.)  Defendants note that RDK's expert economist—when asked how the Body Builder's refusal to sell to current Mack accounts would affect RDK—stated "I don't know that it would necessarily affect RDK.  I haven't thought about that from a damage perspective."  (Defs.' Mot. Summ. J. 46 & Ex. 47, Gollop Dep. 268:17-268:24.)

Second, Defendants note that if RDK is an established Mack account, this conspiracy claim is a redundancy given RDK's other claim of a three-way conspiracy to deny it access to discounted trucks from McNeilus and Heil.  (Defs.' Reply Br. 36.)  Moreover, this claim conflicts with RDK's other three-way conspiracy claim namely that the Body Builders were competing vigorously for RDK's business up until the creation of that three-way conspiracy.  (Id. at 36-37.)  Yet, in this claim, RDK asserts that it was an established Mack account that the Body Builders were boycotting.

_____

14.  This latter argument, while unclear, seems to suggest that had RDK possessed "established Mack accounts" it would not have objected to the Body Builder's antitrust behavior because it would have profited RDK.

36

Finally, Defendants note that there is no evidence that RDK was an established Mack account, meaning an end user who has "historically purchased the truck chassis from the Mack distributor network." (Pls.' Resp. Mot. Summ. J. 19 (citing to ¶ 36 of Defs' Answer to Third Am. Compl.).) Paragraph 36 of Defendants Answer to the Third Amended Complaint states that:

> Mack unilaterally imposed on McNeilus and Heil, separately, as a condition of their purchasing Mack chassis at discounted prices, two conditions. First, they were not to sell trucks incorporating Mack chassis to established Mack accounts (where the end user already uses Heil or McNeilus bodies but historically buys the chassis separate from the Mack distributor network). Second, they were not to sell to entities other than end users through their distributor networks.

(Defs.' Answer to Third Am. Compl. ¶ 36.) Contrary to RDK's assertion, this paragraph does not suggest that RDK was an "established Mack account" as the Answer defines established accounts as: (1) "end users;" (2) who use Heil or McNeilus bodies, but (3) buy their chassis "from the Mack distributor network." Id. RDK may have met two of these three conditions. RDK bought trucks from the Mack distributor network, and it did use Heil and McNeilus bodies. But RDK has never been an end user, and thus does not meet the criteria set forth in this Answer.

That said, in as much as RDK asserts that it was an established account to whom the Body Builders refused to sell to, this claim mirrors its prior claim of a three-way conspiracy. This Court dismissed that prior claim due to RDK's failure to provide evidence sufficient to adduce the existence of a three-way conspiracy. For the same reason, this claim warrants summary dismissal.

37

To the extent that RDK asserts that the Body Builders declined to compete with
Mack dealers for certain customers, RDK does not have standing to bring this claim as it has not
suffered an antitrust injury.  To assert a claim under the federal antitrust laws, the plaintiff must
have suffered an antitrust injury, "of the type the antitrust laws were intended to prevent and that
flows from that which makes the defendant's acts unlawful."  Brunswick Corp., 429 U.S. 477,
489 (1977).  By reducing the number of competitors seeking to sell to established Mack
accounts, this alleged conspiracy decreases the number of competitors and must necessarily
benefit RDK.

Either way, this Court finds that summary judgment dismissal of RDK's third
antitrust claim appropriate.[15]

### C.    RDK's Claims Under Florida's Deceptive and Unfair Trade Practices Act[16]

RDK alleges that Defendants "have engaged in unfair and deceptive trade
practices in violation of the Florida Deceptive and Unfair Trade Practices Act" (Unfair
Practices).  (Third Am. Compl. ¶¶ 77 - 80.)  See Fla. Stat. § 501.201 et seq.  RDK claims that it
has suffered damages in excess of $1,000,000, and is entitled to recover actual damages, costs of
this suit, and attorneys' fees.  (Id. at ¶ 80.)  RDK also seeks "a preliminary and permanent

---

15.  RDK also asserted claims for relief under Florida's Antitrust Act (Fla. Stat. § 542.15 et seq.) (Id. ¶¶ 71-77).
Florida's Antitrust Act mirrors the Sherman Act.  Accordingly, the claims brought under this Act are dismissed along
with the three Sherman Act claims.  See All Care Nursing Serv. v. High Tech Staffing Servs., 135 F.3d 740, 746
(11th Cir. 1998) ("It is the intent of the Legislature that, in construing this chapter, due consideration and great
weight be given to the interpretations of the federal courts relating to comparable federal antitrust statutes."); see also
St. Petersburg Yacht Charters, Inc. v. Morgan Yacht, Inc., 457 So.2d 1028, 1032 (Fla. Dist. Ct. App. 1984) ("The
Florida legislature has, in effect, adopted as the law of Florida the body of antitrust law developed by the federal
courts under the Sherman Act.").

16.  Neither Plaintiff nor Defendants oppose Plaintiff's application of Florida law.  As such, this Court will analyze
the these claims based upon Florida law.

injunction enjoining MTI, McNeilus and Heil from engaging in deceptive and unfair trade practices in violation of the Florida Unfair and Deceptive Trade Practices Act." (Third Am. Compl. 19.)

The Unfair Practices Act proscribes any "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." FLA. STAT. § 501.204(1). The Unfair Practices Act "was created with the intention of providing Florida consumers with a simplified statutory cause of action that provides additional remedies to recover economic damages incurred as a result of a product or service purchased, where a seller used unfair or deceptive practices or acts." Hunter v. Bev Smith Ford, LLC, Civ. A. No. 07-80665, 2008 WL 1925265, at *7 (S.D. Fla. Ap. 29, 2008) (noting Jones v. TT of Longwood, Inc., Civ. A. No. 06-651, 2007 WL 2298020, at *6 (M.D. Fla. Aug. 7, 2007)). "[A] consumer claim for damages under FDUTPA has three elements: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages." Spinelli v. Capital One Bank, Civ. A. No. 08-132, 2009 WL 700705, at *5 (M.D. Fla. Mar. 14, 2009) (quoting Rollins, Inc. v. Butland, 951 So.2d 860, 869 (Fla. 2d DCA 2006), review denied, 962 So.2d 335 (Fla. 2007)).

Defendants offer two bases for a grant of summary judgment on this claim. First, they assert that RDK's Unfair Practices Act claim constitutes improper bootstrapping onto its conspiracy claims. (Defs.' Mot. Summ. J. 47.) Defendants note that RDK's "antitrust conspiracies are based on a theory of boycott," arguing that such claims are not appropriate as the Unfair Practices Act does not bar refusals to deal. (Id. (citing Yachting Promotions, Inc. v. Broward Yachts, Inc., 792 So.2d 660, 664 (Fla. App. Ct. 2001) (holding that refusal to deal with exhibitor because of past litigation was not barred under the Unfair Practices Act as refusing to

do business is neither an unfair nor deceptive trade practice).)  "An unfair practice under the federal statute has been defined as one that 'offends established public policy' and one that is 'immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.'" Yachting Promotions, Inc., 796 So.2d at 664 (citing Samuels v. King Motor Co. of Fort Lauderdale, 782 So.2d 489, 499 (Fla. 4th DCA 2001) (citing Spiegel, Inc. v. FTC, 540 F.2d 287, 293 (7th Cir. 1976)).

Second, Defendants contend that the Unfair Practices Act only permits recovery of actual damages and as such RDK's efforts to recover consequential damages under the Act are improper.  (Defs.' Mot. Summ. J. 48) (citing to Fla. Stat. 501.211(2)).[17]  The Court will examine each claim in turn.

### 1.    Refusal to Deal Under the Unfair Practices Act

Defendants argue that summary judgment is warranted, under Yachting Promotions, as RDK "alleges nothing more than that Defendants refused to sell to it, either at all or at RDK's preferred prices."  Id. at 47.  RDK counters by noting that the Unfair Practices Act scope is "broad" and not limited by the examples of violations provided for by the statute.  (Pls.' Resp. Mot. Summ. J. 68-69 (citing the "non-exhaustive" list of Unfair Practices Act violations provided for in Fla. Sta. § 501.203(3)).)  Florida courts have noted that the list of violations in §

---

17.  Fla. Stat. 501.211(2) provides:

> In any action brought by a person who has suffered a loss as a result of a violation of this part, such person may recover actual damages, plus attorney's fees and court costs as provided in s. 501.2105.  However, damages, fees, or costs are not recoverable under this section against a retailer who has, in good faith, engaged in the dissemination of claims of a manufacturer or wholesaler without actual knowledge that it violated this part.

501.203(3) is not exclusive and that the statute also covers "antitrust violations."  (Id. at 69

(quoting Mack v. Bristol-Myers Squibb, Co., 673 So.2d 100, 104 (Fl. Ct. App. 1996)).)  Further,

RDK distinguishes Yachting Promotions from the present suit noting that the former "only

involved a *unilateral* refusal to deal" while the latter involves Defendants' "concerted action

intended to cut off RDK's access to discounted Mack trucks."  (Id. at 69.)

It is clear that some, if not all, of RDK's claims under the Unfair Practices Act are

based upon "antitrust violations."  (Id.)  Given that this Court has determined that RDK has

failed to prove the existence of a conspiracy necessary to sustain antitrust claims, RDK may not

use these claims to sustain its Unfair Practices Act claims.  While all Unfair Practices Act claims

based on antitrust violations are dismissed, this Court, for two reasons, does not dismiss all of

RDK's claims under the Unfair Practices Act.

First, the Unfair Practices Act has been interpreted more expansively than has the

Sherman Act.[18]  As a result, a claim that fails to state an antitrust violation does not necessarily

fail to fit within the contours of the Unfair Practices Act.[19]  RDK has provided evidence

suggesting that Mack urged that the Body Builders to cease providing RDK with discounted

_____

18.  The plain text of the Sherman Act is broad barring "every contract, combination in the form of trust or
otherwise, or conspiracy, in restraint of trade or commerce among the several States . . . is declared to be illegal." 15
U.S.C. § 1 (2004).  Yet courts have not read the statute literally finding that the Act only prohibits contracts,
combinations, or conspiracies that unreasonably restrain trade.  Bus. Elec. Corp. v. Sharp Elec. Corp., 485 U.S. 717,
723 (1988).  Florida's Unfair Practices Act is similarly broad encompassing "unfair or deceptive acts or practices
committed in the conduct of any trade or commerce," but it has not been limited in the manner that the Sherman Act
has been and, in fact, it has been held to cover actions not listed in the statute.  See Mack v. Bristol-Myers Squibb,
Co., 673 So.2d at 104.

19.  This Court dismisses any Unfair Practices claim as it applies to RDK's vertical conspiracy claims.  (See Third
Am. Compl. ¶¶ 77-80.)  RDK has failed to show that Mack's decision to deny dealers sales assistance, when selling
to RDK, was anything more than a permissible, unilateral decision by Mack.  Given Mack's ability to make such
unilateral pricing decisions coupled with RDK's failure to show a consensus among Mack's dealers, with regard to
RDK, it is clear that RDK cannot show that Mack engaged in a deceptive.  See Dunn, 193 F.3d at 1191.

Mack chassis.[20]  After such requests were made, both Body Builders changed their sales approach to RDK.  RDK alleges that McNeilus reneged on its 2004 Waste Expo contract with RDK, delayed quotes, and eventually ceased quoting to RDK.  Similarly, RDK alleges that Heil ceased providing trucks directly to RDK, and instead RDK was forced to deal with Midwest Power.  Defendants have provided their own set of evidence suggesting that the Body Builders' actions were taken independent of either Mack or one another.  Defendants' have rebutted RDK's claims regarding a Mack-McNeilus-Heil conspiracy to commit any antitrust violation.  By the same token, however, Defendants' evidence underscores the existence legitimate issues of material fact.  These facts, while not sufficient evidence to sustain a claim of an antitrust violation—given that they do not rule out independent, economically-beneficial parallel behavior—provide sufficient evidence to sustain RDK's claims under the Unfair Practices Act.  Determination of whether or not Defendants' actions were "unfair or deceptive" and thus barred by the Unfair Practices Act is a question of fact that should be addressed by the jury.

### 2.    Scope of Damages Under the Unfair Practices Act

Defendants argue that summary judgment dismissal of RDK's damages claim is warranted as the Unfair Practices Act only provides for recovery of actual damages and not the recovery of "alleged past and future lost profits" or consequential damages.[21]  (Defs.' Mot. Summ. J. 48.)  RDK, in response, states that it seeks "actual damages in the form of lost past profits."  (Pls.' Resp. Mot. Summ. J. 71 (citing Third Am. Compl. 19).)  Defendants note that the

---

20.    This Court finds that RDK has no grounds for any Unfair Practices claims against Mack regarding RDK's claims of an antitrust conspiracy between Mack and its dealers.

21.    This Court does not address RDK's claim for injunctive relief since Defendants' do not dispute the availability of such relief.

Unfair Practices Act does not provide for recovery of "lost profits" but rather only for actual

damages which, in this case, would be the difference between the amount paid by RDK and the

amount it should have paid.  (Defs.' Reply Br. 38.)

      "Section 501.211, Florida Statutes (1981), authorizes a consumer to recover actual

damages, attorney's fees, and court costs for a violation of the statute."  Urling v. Helms

Exterminators, Inc., 468 So.2d 451 (Fla. App. DCA 1985).  Florida courts note that "actual

damages" is a term of art referring to

> the difference in the market value of the product or
> service in the condition in which it was delivered
> and its market value in the condition in which it
> should have been delivered according to the
> contract of the parties.  A notable exception to the
> rule may exist when the product is rendered
> valueless as a result of the defect-then the purchase
> price is the appropriate measure of actual damages.
> [citations omitted]

Rollins, Inc. v. Heller, 454 So.2d 580, 585 (Fla. 3d DCA 1984) (quoting Raye v. Fred Oakley

Motors, Inc., 646 S.W.2d 288, 290 (Tex. App. 1983)).  It is clear that the Unfair Practices Act

permits declaratory relief.  FLA. STAT. § 501.211(1).  The Act also provides for actual damages,

attorney fees, and costs.  Id. at § 501.211(2).  Florida courts have clearly defined "actual

damages," and this Court agrees with Defendants that actual damages would be any difference

between the cost of the trucks as delivered as opposed to the price at which they should have

been delivered.  In as much as this difference constitutes "lost past profits," RDK may recover

them.  RDK may not  recover for speculative damages arising from business it may have

contracted but for Defendants' interference.  As such, summary dismissal of the relief sought by

RDK is denied.  Accordingly, should RDK show that Defendants violated the Unfair Practices

Act, it will be able to recover, in addition to injunctive relief, cost, and attorneys fees related to this portion of their claim, any actual damages.

     **D.**      **Tortious Interference with Existing and Prospective Business Relations**[22]

       Plaintiffs assert two claims for tortious interference with existing and prospective business relations. The first[23] claim, against all Defendants, asserts that "RDK had business relationships and business expectancies with customers to whom it had previously sold Mack refuse trucks." (Third Am. Compl. ¶¶ 82-84.) Defendants knew of and "improperly, maliciously and intentionally interfered" with these expectancies and relationships. (Id.) Defendants' interference led to the disruption or termination of these relationships and expectancies resulting in ongoing damages in excess of $1,000,000. (Id. at ¶¶ 84-85.) RDK also seeks punitive damages from Mack because its actions were "intentional, malicious, reckless, outrageous and egregious." (Id. at ¶ 86.) The second[24] claim of tortious interference asserts that RDK had business relationships and expectancies with McNeilus and Heil who but for Mack's interference would have sold "Mack refuse trucks to RDK at significant discounts below their 'list' prices but for MTI's conduct." (Id. at ¶¶ 88-90.)

       Defendants note that "RDK nowhere explains in the Third Amended Complaint what Defendants did to interfere, referring instead just to 'conduct alleged herein.'" (Defs.'s Mot.

---

22. Counts four and five both assert claims for "Tortious Interference with Existing and Prospective Business Relations." (Third Am. Compl. ¶¶ 81-92) Count four names Mack, McNeilus, and Heil. Count five only names Mack. (Id. at ¶¶ 81-86.) These claims are redundant and as such will be considered as one claim. (Id. at ¶¶ 87-92.)

23. (Third Am. Compl. ¶¶ 82-86.)

24. (Third Am. Compl. ¶¶ 87-92.)

Summ. J. 48 (quoting Third Am. Compl. ¶ 85).)  Defendants assert that RDK is "seeking to

bootstrap its antitrust theory onto a state law claim," and such claims are futile as unilateral

refusals to deal with a business do not amount to tortious interference with potential or actual

contracts.  (Id. at 48-49.)

> Further, Defendants note that the allegations of Mack's tortious interference are

without basis as: (1) there is no "evidence that Heil or McNeilus breached any actual, existing

contract with RDK (much less was induced to do so by Mack), nor are any such facts even so

much as alleged in the Third Amended Complaint;" and (2) Mack's lobbying of the body

builders "to cease sales to RDK was proper and justified as Mack sought only to protect its

legitimate business interests in fostering the financial strength of its dealer network."  (Id. at 49-

50.)  In support of the second proposition, Defendants noted that summary judgment is warranted

on claims of tortious interference where defendant sought to protect a legitimate business

interest.  (Id. at 50 (noting Windsor Sec., Inc. v. Hartford Life Ins. Co., 968 F.2d 655, 665-666

(3d Cir. 1993).)

> RDK rebuts Defendants' assertions noting that a business relationship need not

have been reduced to a contract for there to have been interference.  Rather, a business

relationship may be evidenced by "an actual and identifiable understanding or agreement which

in all probability would have been completed if the defendant had not interfered.  (Pls.' Resp.

Mot. Summ. J. 71-72 (quoting Gossard v. Adia Servs., Inc., 723 So.2d 182, 184 (Fla. 1998).)

Florida law courts have "recognized the propriety of a claim for tortious interference when, as in

the case here, a plaintiff alleges that *multiple parties acted in concert* to refuse to deal with

plaintiff and interfere with plaintiff's business relationships."  (Id. at 73.)

To state a claim for tortious interference with a business relationship under Florida law, a plaintiff must allege "(1) the existence a business relationship, (2) the defendant's knowledge of that relationship, (3) an intentional and unjustified interference with the relationship, and (4) injury resulting from the breach of the relationship." Dunn v. Air Line Pilots Ass'n, 193 F.3d 1185, 1191 (11th Cir. 1999). The gravamen of such a cause of action is "the malicious interference with a third-party business relationship. The third element of either tortious interference cause captures this important point." In re Managed Care Litig., Civ. A. No. 00-1334, 2009 WL 347795, at * 7 (S.D. Fla. Feb. 11, 2009).

RDK's specific claims of tortious interference reads as little more than a conclusory litany of misdeeds stating that Defendants "actions were wrongful, improper, malicious and intentional," and that Mack's actions were intentional, malicious, reckless, outrageous, wrongful, improper, and egregious. (Third Am. Compl. ¶¶ 86, 90, & 92.) Such pleadings, in and of themselves, are not sufficient to withstand summary dismissal. But RDK does provide a more extensive basis for its claim stating that Mack "wrongfully, improperly, maliciously, and intentionally interfered" with the relationships and business expectancies of RDK by: (1) Mack's requesting that Heil not sell to RDK; (2) McNeilus's cancelling of its 2004 Waste Expo sales contract with RDK; and (3) McNeilus's having Midwest Power bar its sales to RDK. (Defs.' Mot. Summ. J., Ex. 49, RDK's Objections and Responses to Defendant Mack Truck's First Set of Interrogatories,11-12.) RDK notes that "[f]or a time, RDK enjoyed profitable relationships with both body builders" that were likely to grow but for Mack's orchestration of arrangements to have these body builders "stop selling discounted trucks to RDK." (Pls.' Resp. Mot. Summ. J. 74-75.)

46

As noted previously, RDK has failed to provide evidence sufficient to avoid summary dismissal of its antitrust claims.  But summary dismissal of RDK's tortious interference claims is inappropriate.  RDK has presented sufficient evidence for a jury to conclude that Defendants intentionally and unjustifiably interfered with RDK's existing and potential business relationships with McNeilus and Heil.[25]  Defendants have provided extensive evidence seeking to justify their actions.  In response to RDK's claims of tortious interference, Defendants' have noted that their actions were legitimate, unilateral refusals and such unilateral actions are not sufficient to sustain RDK's state law claims.  (Defs.' Reply Br. 37.)  Defendants' arguments have shown why summary dismissal is inappropriate—they claim that their actions were unilateral while RDK alleges that the same actions were the actions of multiple parties.  As a result, this Court faces competing factual claims and as a result summary judgment is not warranted.

## III.      RDK'S MOTION FOR SUMMARY JUDGMENT ON DEFENDANTS' COUNTERCLAIM

On April 23, 2008, RDK filed a Motion for Summary Judgment seeking dismissal of Mack's Counterclaims filed with its Answers to RDK's Third Amended Complaint.  For the reasons discussed below, RDK's Motion is granted in part and denied in part.

### A.      <u>Legal Standards: Civil Conspiracy</u>

---

25.  This Court dismisses any tortious interference claim as it applies to RDK's vertical conspiracy claims.  RDK has failed to show that Mack's decision to deny dealers sales assistance, when selling to RDK, was anything more than a permissible, unilateral decision.  Given Mack's ability to make unilateral pricing decisions as well as RDK's failure to show that Mack's dealers agreed among themselves that Mack should deny sales assistance on sales to third party dealers.  RDK cannot show that Mack intentionally and unjustifiably interfered with RDK's relationship with Mack dealers much less that RDK suffered an injury resulting from such interference.  <u>See Dunn</u>, 193 F.3d at 1191.

Under Pennsylvania law, in order to prove a civil conspiracy claim, one must show:  (1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose; (2) an overt act done in pursuance of the common purpose; and (3) actual legal damage.  Gen. Refractories Co. v. Fireman's Fund Ins. Co., 337 F.3d 297, 313 (3d Cir. 2003) (quoting Strickland v. Univ. of Scranton, 700 A.2d 979, 987-988 (Pa. Super. Ct. 1997)).  In alleging a civil conspiracy, one must plead particularized facts, "addressing the period of the conspiracy, the object of the conspiracy, and certain actions of the alleged conspirators taken to achieve that purpose."  Bair v. Purcell, 500 F. Supp. 2d 468, 500 (M.D. Pa. 2007).

A plaintiff must allege that the defendant had an unjustified intent to injure, or acted with malice.  Guy Chem. Co., Inc. v. Romaco S.p.A., Civ. A. No. 06-96, 2009 WL 840386, at *16 (W.D. Pa. Mar. 27, 2009) (citing Thompson Coal Co. v. Pike Coal Co., 412 A.2d 466, 472 (Pa. 1979)).  Under Pennsylvania law, "[a]n essential element of proof for a conspiracy is malice or intent to injure."  Becker v. Chi. Title Ins., Co., Civ. A. No. 03-2292, 2004 U.S. Dist. LEXIS 1988, at *39 (E.D. Pa. Feb. 4, 2004) (citing Strickland v. Univ. of Scranton, 700 A.2d 979, 987 (Pa. Super. Ct. 1997)).

Malice can only be found "when the sole purpose of the conspiracy is to cause harm to the party who has been injured."  Id. (citing Thompson Coal Co. v. Pike Coal Co., 412 A.2d 455, 472 (Pa. 1979)); see e.g., Guar. Towers, LLC v. Cellco P'ship, Civ. A. No. 07-554, 2007 WL 2617651, at *6 (M.D. Pa. Sept. 6, 2007) (dismissing claim for civil conspiracy where plaintiff alleged that both defendants acted to obtain more revenue through the conspiracy and thus did not have the sole intent to injure the plaintiff); WM High Yield Fund v. O'Hanlon, Civ.

48

A. No. 04-3423, 2005 WL 1017811, at *14 (E.D. Pa. April 29, 2005) (noting that a civil

conspiracy claim fails when the plaintiffs acknowledged that the defendants' intent was to raise

new capital to fund [the] growth of a nonparty corporation, thereby negating malice solely to

injure plaintiffs).

A civil conspiracy may not be found unless a plaintiff provides evidence  that the

defendant had an unjustified intent to injure, or acted with malice. Guy Chem. Co., 2009 WL

840386, at *16.  All of the above elements may be proven circumstantially, by subsequent acts of

the alleged conspirators, provided that the evidence is "full, clear and satisfactory."  Reading

Radio, Inc. v. Fink, 833 A.2d 199, 212 (Pa. Super. Ct. 2003) (citing Rumbaugh v. Beck, 601

A.2d 319, 325 (Pa. 1991)).

A civil conspiracy claim may proceed only when there is a cause of action for an

underlying act.  Nix v. Temple Univ., 596 A.2d 1132, 1137 (Pa. Super. Ct. 1991).  "Since

liability for civil conspiracy depends on performance of some underlying tortious act, the

conspiracy is not independently actionable; rather, it is a means of establishing vicarious liability

for the underlying tort."  Boyanowski v. Capital Area Intermediate Unit, 215 F.3d 396, 407 (3d

Cir. 2000) (citing Halberstam v. Welch, 705 F.2d 472, 479 (D.C. Cir. 1983)).

Mack's underlying claim is one for fraud.  "Fraud consists of anything calculated

to deceive, whether by single act or combination."  Am. Indep. Ins. Co. v. Lederman, Civ. A. No.

97-4153, 2000 WL 1209371, at *14 (E.D. Pa. Aug. 25, 2000) (quotation omitted).  In order to

sustain a claim for fraud, the claimant must show:  (1) misrepresentation; (2) a fraudulent

utterance; (3) intention by the maker of the statement that the recipient will thereby be induced to

act; (4) justifiable reliance upon the misrepresentation; and (5) damage to the recipient as the proximate result of the misrepresentation.  Id.

### B.    Background

Like RDK's underlying Third Amended Complaint, Mack's Counterclaim revolves around Mack's provision of sales assistance to its dealers.  This opinion previously addressed Mack's process for granting or denying sales assistance.  That said, it bears noting that RDK, in its Third Amended Complaint, states that starting in 2001, Mack entered into an unlawful scheme, with its dealers and two body builders, to deny extra sales assistance for the sale of Mack chassis to third-party distributors, like RDK.  (Third Am. Compl. ¶¶ 32-33.) Mack's Counterclaim asserts that, in 2004, RDK conspired with three Mack dealers to obtain sales assistance and rebates for Mack chassis.  (Mack's Answer and Countercl. 20.)  This Court will analyze the alleged transactions in turn.

### 1.    Worldwide Transactions

Mack alleges that its expert report, the Molder Report,[26] evidences a conspiracy between RDK and Worldwide, a Mack dealer located in Tennessee, Kentucky, and Ohio.  (Pls.' Mot. Summ. J. 14.)  Mack claims that the conspiracy between Worldwide and RDK involved seventeen chassis and defrauded Mack of roughly $140,000.  (Mack's Resp. Mot. Summ. J. 16.) Mack alleges that Todd Van Ahn, who at the relevant time was a Worldwide employee, "submitted ESA [extra sales assistance] requests for the trucks he sold to RDK in the name of Clean Earth."  (Mack's Resp. Mot. Summ. J., Ex. 12, Molder Report 15.)

---

26.   The Molder Report is found at: (1) Mack's Resp. Mot. Summ. J., Ex. 12; and (2) Pls.' Mot. Summ. J., Ex. 4.

Clean Earth LLC (Clean Earth) was a struggling company trying to create a ready truck business. As a result of financial problems, Clean Earth entered into a financing agreement with RDK so it could purchase Mack chassis from Worldwide. (Pls.' Mot. Summ. J. 14, 20 (quoting Ex. 10, Kemner Decl. ¶¶ 7-10) (noting that RDK paid for the chassis prior to delivery to Clean Earth).) After Clean Earth obtained the chassis, either Clean Earth or RDK could sell the trucks. (Id.)

Despite RDK's financing, Clean Earth filed for bankruptcy, and its assets were purchased by EZ Pack Holdings LLC (EZ Pack).[27] (Pls.' Mot. Summ. J. 14 (citing Ex. 4, Molder Report 7).) EZ Pack and RDK continued the existing funding arrangement whereby "RDK paid Worldwide for trucks which were delivered to Clean Earth/EZ Pack to be mounted with bodies." (Id.) The completed ready trucks could be sold by Clean Earth/EZ Pack or RDK. (Id.)

RDK admits that "Worldwide initially identified Clean Earth as the purchaser on the truck titles for these units, but RDK insisted that the titles be amended to reflect the fact that RDK, which fronted the money for the units under its financing agreement with Clean Earth/EZ Pack, was the purchaser of the trucks." (Id. at 15 (citing Ex. 7, Richard Kemner Dep. ("Kemner Dep.") 246:3-18, 247:9-17, 248:3-16, Jan 9, 2006).) Mack disputes RDK's explanation. Instead, Mack asserts that several steps were taken to accomplish the RDK-Worldwide fraud. First, Worldwide would submit a sales assistance request to Mack, identifying Clean Earth as the buyer of the Mack chassis. At that time, the Manufacturer's Certificate of Origin was transferred to Clean Earth. Then, Worldwide would submit a "Retail Delivery Notice" to Mack representing the chassis as sold to Clean Earth. (Id. at 16 (citing Ex. 12, Molder Report 15).) Unbeknownst

---

27. RDK is an authorized EZ Pack dealer.

to Mack, Worldwide then created an "Affidavit of Correction" that changed the name of the buyer on the title transfer from Clean Earth to RDK.  (Id.)  Further, RDK—and not Clean Earth—paid for the chassis, even though Worldwide produced multiple invoices for the same chassis, one to Clean Earth and another invoice to RDK.  (See Ex. 36, Invoice to Clean Earth for Truck J227 and Invoice to RDK for Truck J227 (invoices marked confidential and showing the same sale price—$100,885—for truck J227 billed respectively to Clean Earth and RDK).)  Finally, RDK, not Clean Earth, sold all seventeen chassis bought by Clean Earth.  (Id. at 16-17.)

In its Motion for Summary Judgment, RDK argues that "no jury could reasonably infer based on the record evidence that RDK entered into an agreement with Worldwide to defraud Mack."  (Id.)  RDK asserts that, even if there exists evidence that it knew of Worldwide's misrepresentations, this evidence is not sufficient  to withstand summary judgment as conspiracy liability does not arise unless a party participated in the underlying unlawful act.  (Id. (citing Commerce Bank v. First Union Nat'l. Bank, 911 A.2d 133 (Pa. Super. Ct. 2006); Brett Senior & Assoc. v. Fitzgerald, Civ. A. No. 06-1412, 2007 U.S. Dist. LEXIS 50833, at *28 (E.D. Pa. Jul. 13, 2007).)  RDK states that there is no evidence that it desired, much less undertook with Worldwide, any unlawful actions to obtain Mack chassis.  Instead, "RDK and Clean Earth/EZ Pack had a legitimate business relationship pursuant to which trucks were purchased from Worldwide."  (Id. at 22-23.)

RDK notes that, in Commerce, the court granted the defendant's motion for summary judgment even though it assumed that the defendant "knew that a third party company was engaged in wrongdoing but did nothing to stop it."  (Id. at 24.)  RDK states that "Mack has adduced no evidence that it knew there was anything inappropriate about Worldwide requesting

ESA in the name of Clean Earth."  (Id.)  Further, "[m]ultiple Mack dealers and Mack's own Rule

30(b)(6) designee testified under oath that Mack considered it appropriate for Mack dealer to

indicate the *end user* on an ESA request, as opposed to naming a third party distributor like RDK

as the customer on an ESA request."  (Pls.' Mot. Summ. J. 9 (noting Ex. 8, Arlyn Campbell Dep.

("Campbell Dep.") 62:3-63:25, Dec. 18, 2007; Ex. 16, Steven Ralich Dep. ("Ralich Dep.") 35:4-

22, Nov. 20, 2007; Ex. 11, Ronald Gerhard Dep. ("Gerhard Dep.) 151:5-18, Jan 18, 2008).)

      First, as a threshold matter, this Court finds that RDK's claim, that neither it nor

Mack's dealers knew of any uniform policy for requesting sales assistance, runs counter to the

core of RDK's antitrust case.  In its Third Amended Complaint, RDK asserts that starting in

2001, Mack and its franchised dealers initiated a conspiracy to deny sales assistance for chassis

sold to RDK.  (Third Am. Compl. ¶ 32-33.)  This conspiracy gives rise to the antitrust violations

at the core of RDK's lawsuit.  RDK's antitrust claims lack any basis if Mack dealers, in 2004,

could simply list end users making no reference to third-party distributors like RDK.  If this is

indeed the case, there would never be an instance where dealers needed to list RDK on any sales

assistance form.  Looking at this evidence in a light most favorable to Mack, RDK's own

complaint suggests that it knew, that when seeking sales assistance on sales to RDK, Worldwide

was obligated to list RDK.

      Mack's argument, however, does not simply rely upon inferences drawn from

RDK's Third Amended Complaint.  Rather, it provides both emails and deposition testimony

supporting its claim that Worldwide and RDK were aware of and jointly participated in this

conspiracy to defraud Mack.  Mack notes that on March 29, 2006, Worldwide's Sam Huffman

emailed RDK's Kemner asking for information, stating:

> I enjoyed our conversation yesterday. Attached is (sic) spec's for 5 06 LE's on our lot. As you can see our net invoice before assistance is 102,184, so we need Clean Earth info to apply for additional money. Mike has already priced you these units at Rumpke's cost (under discretionary terms we discussed) at $106,500. Hopefully Clean Earth will get deeper than that.

(Mack's Resp. Mot. Summ. J. 18 (quoting Ex. 14, Huffman Mar. 29, 2006 email).) Mack claims that this email shows that Worldwide contacted RDK about plans to request sales assistance, on sales to RDK, by representing to Mack that the sales were for Clean Earth.

Providing insight into Huffman's email is the deposition of Terry Dotson, Worldwide's owner. In his deposition, Dotson stated:

> Q: Okay. What would be your opinion of Mr. Huffman's reasoning of the way the deal had been structured if RDK accepted the truck from Worldwide and then on its own sold it to a completely different entity than Clean Earth?
>
> A: **The only thing I can tell you is based upon what I knew and what I had been told up until the time that this came up, we were doing business with a company called Clean Earth. The name RDK was never mentioned to me or anybody in upper management in this company.**
>
> If that name had been mentioned to me, I would have told the people that they needed to go back and get sales assistance in the name of that particular company, because that particular company has tried to buy trucks from us before, and I've applied for sales assistance and not gotten that sales assistance – or our people have. I don't – that not my business why people do things. It's just a fact.
>
> And I don't know why, what happened. I don't know what they were trying to do. I don't know

54

what the arrangements were between Clean Earth
and RDK.  I don't know what RDK told any of our
people.  I don't know what our people told them.

**I can only tell you that based upon the way we
do business, we do business with the people we
sell trucks to, and we're up front and we're
honest about what we do.  I am fully convinced
that somewhere in this deal someone is not being
honest with someone, and it damn well better not
be one of our people.**

(Id. at 18 (quoting Dotson Dep. 145:18-147:2) (emphasis added).)

On May 19, 2006, Worldwide's Van Ahn emailed Kemner listing eight trucks that

would be built on August 21 and offered for sale to RDK.  (Id. (Ex. 32, Van Ahn May 19, 2006

email).)  Van Ahn also referenced three other trucks, that were being built, which Rumpke had

the first option to buy.  (Id.)  Although written to RDK, Van Ahn's email did not quote a price

for RDK. Rather, the email listed prices for Rumpke and Clean Earth stating:

The preceding prices carry only standard factory
Warranty.  As discussed on the phone, if Bill
Rumpke will agree, he will need to sign off on the
titles showing them as used trucks being sold to
you.  One of the challenges of this process will be
the FET,[28] since Rumpke is non-exempt I see no
way to get around paying that, maybe Sam or you
have some input that I don't see.

(Id.)  Mack asserts that this email indicates that Worldwide sought to provide RDK with trucks

that Mack believed were intended for Rumpke or Clean Earth.  (Id. at 41.)  Further, the email

suggests that Worldwide, Rumpke, and RDK conspired to mark new trucks as "used," transfer

them to RDK, and try to avoid tax liability.

---

28.  Mack claims that "FET" refers to "federal excise tax."  (Id. at 41.)

Later, on September 15, 2006, Van Ahn again emailed RDK's Kemner expressing

concern that use of Affidavits of Correction would not conceal the alleged fraud from Mack.

> Also after looking at the title/MSO issues we face
> the most advantageous for us is to title them in Ohio
> then flip them into RDK.  That way Mack will have
> no chance at charging me back for the sales
> assistance when they track the Polk data.  I defiantly
> (sic) cannot do the affidavit, because there will be
> no record of Clean Earth ever titling the truck and
> that will leave me with no rear end coverage.

(Id. at 17 (quoting Ex. 13, Van Ahn Sept. 15, 2006 email).)  When asked about this arrangement,

Kemner stated at his January 6, 2006 deposition:

> THE WITNESS: Okay.  **This is an attempt with,
> under the advice of Mr. Todd Van Ahn, to
> secure additional discounting by using Clean
> Earth**, which at that time was the E-Z Pack dealer
> who was in his responsibility.  This is a way he
> could figure out he could get a discount by selling
> the trucks and getting a discount level that far
> exceeded what RDK was, although Clean Earth had
> never bought a truck for him before.

(Id. (quoting Kemner Dep. 242:2-10) (emphasis added).)  Kemner further testified:

> A. Todd Van Ahn definitely knew about it.  He's
> the one that did it.
> Q. Let me back up.  To get the greater sales
> assistance, Todd Van Ahn told Mack that this
> vehicle or vehicles were destined for a customer
> other than RDK.
> A. That's correct.
> Q. Which customer?
> A. In this case, it looks like Clean Earth.

(Id. (quoting Kemner Dep. 243:7-17).)

When faced with Van Ahn's September 6, 2006 email to Kemner, Dotson

56

surmised:

Q: Okay. Well, let's look at this last page, please, which is another email from Todd Van Ahn to Richard Kemner dated September 15, 2006, starts, "If anyone is going to get one hell of a deal, I want it to be you."

I'd like to discuss this last paragraph, if you'll take a look at the last paragraph. I'll give you a minute to read it.

A. Okay.

Q. First sentence says, "After looking at the title/MSO issues, we face (sic) the most advantageous for" – "we face the most advantageous for us is to title them in Ohio then flip them into RDK." In your opinion as president of Worldwide, what is your salesman saying there?

MR. PARKS: Objection, calls for speculation.

THE WITNESS: **The world "flip" or the word "spinoff" in this industry refers to a truck that's been sold that was ordered in another customer's name. And it's not something we do, but it's something that I would speculate that that's what he's referring to. And when he goes on and says "so they cannot track the affidavit," then it makes – it leads me to believe that Todd knew he was not doing things the way we do business.**

Q. Okay. If you'll look at the fourth line down in that paragraph, starts with the word "I," its says, "I defiantly (sic) cannot do the affidavit because there will be no record of Clean Earth ever titling the truck, and that will leave me with no rear end coverage." In your opinion, what is your salesman discussing there?"

MR. PARKS: Objection, calls for speculation.

57

THE WITNESS: **In my opinion, he is saying that if the truck is not titled in the name of Clean Earth**, then the Polk registrations won't show that it went with the sales assistance it was approved for.

BY MR. ALCARO:

Q. Okay.

A. And there will be chargeback

Q. Having read this paragraph, do you believe that Mr. Van Ahn was working – having read this photograph, do you – strike that.  **Having read this paragraph, do you believe Mr. Van Ahn was following the policies and procedures of Worldwide?**

**A. No.**

Q. Do you believe his actions helped to have Mack grant sales assistance in the name of an entity that in the end Worldwide did not sell to?

MR. PARKS: Objection. There's no – lack of foundation and calls for speculation.

THE WITNESS: I have no way of knowing what those entities' ties are.  I repeat that we got sales assistance in the name of Clean Earth.  We should have delivered them to Clean Earth.  If we didn't deliver them to Clean Earth, we should have reapplied for sales assistance in another name.  If we were lied to by someone and let to believe Clean Earth and the other were one in the same, I could possibly see where he justified what he was doing. I do not think that that is – I – it should not have been done that way.  It's not the way we do business.

(Id. at 19-20 (quoting Dotson Dep. 151:9-152:9; 152:23-154:13) (emphasis added).)

Dotson's deposition also made clear that had he known the nature of the RDK-Clean Earth/EZ Pack financing and sales arrangement, he would have let Mack know of RDK's participation:

> Q. When an agent [for the ultimate purchaser] is involved, who purchases the truck from Worldwide, the agent or the entity that the agent represents.
>
> MR. PARKS: Objection
>
> THE WITNESS: Well, in the particular instance that you just spoke about, sometimes I've had the agent buy it, and sometimes I've had the entity buy it. **But in every instance that I've been – that I've personally been involved in or known about, it's been fully disclosed of what we were doing, especially if there were – if there was sales assistance involved.**
>
> BY MR. ALCARO:
>
> Q. And by fully disclose, you mean fully disclosed to the manufacturer?
>
> **A. I do not want us to do anything in our company that we don't fully disclose to the people we're partners with.**

(Id. at 21-22 (quoting Dotson Dep. 93:13-94:5) (emphasis added).)

Citing Commerce Bank v. First Union Nat'l. Bank, supra 5, RDK avers that mere knowledge of another's wrongdoing does not support a civil conspiracy claim absent evidence of a common scheme or shared intent. (Id. at 23-24.) In order to survive summary judgment, Mack must provide "full, clear and satisfactory evidence" that RDK and Worldwide combined or agreed to defraud Mack. Brubaker Kitchens, Inc. v. Brown, Civ. A. No. 05-6756, U.S. Dist. LEXIS 56740, at *9 (E.D. Pa. Aug. 15, 2006) (quoting Scully v. U.S. WATS, Inc., 238 F.3d 497,

59

516 (3d Cir. 2001)).  While circumstantial evidence is permitted "[m]ere suspicion or the

possibility of guilty connection is not sufficient, nor proof of acts which are equally consistent

with innocence."  Scully, 238 F.3d at 516.

       Given the difficulty of discovering direct evidence of a conspiracy, circumstantial

evidence is sufficient to prove a civil conspiracy.  Chambers v. Pa., Civ. A. No. 04-714, 2006

WL 3831377, *9 (M.D. Pa. Dec. 28, 2006) (citing Hampton v. Hanrahan, 600 F.2d 600, 621 (7th

Cir. 1979) rev'd in part on other grounds, 446 U.S. 754 (1980)).  Resultingly, a civil conspiracy

"may be proved by acts and circumstances sufficient to warrant an inference that the unlawful

combination had been in point of fact formed for the purpose charged."  Sands v. Wagner, Civ.

A. No. 01-1475, 2008 U.S. Dist LEXIS 2469, at *21 (M.D. Pa. Jan. 11, 2008) (quoting Scully,

238 F.3d at 516 (3d Cir. 2001)).

       Taken in a light most favorable to Mack, Mack has presented considerable

evidence suggesting that RDK and Worldwide acted in combination to obtain improper sales

assistance from Mack.  This evidence consists of more than mere suspicion or acts that could just

as likely have an innocent interpretation.  Instead, the evidence suggests acts and circumstances

sufficient to warrant an inference of unlawful combination.

       RDK's reliance upon both Commerce and Brett Senior is misplaced.  In

Commerce, Commerce Bank claimed that CF Foods used its First Union bank account as a

reference in order to open a Commerce account.  After opening a Commerce account, a CF

Foods employee used this account to defraud Commerce of $900,000.  Id.  RDK asserts that

"[t]he court specifically acknowledged, and dismissed, the fact that First Union *knew about the*

*check-kiting scheme and did nothing to stop it*, but held that this was not enough to render First

Union liable to Commerce Bank for conspiracy." (Pls.' Mot. Summ. J. 22 (citing Commerce, 911 A.2d at 143) (emphasis in original).) The court found that even accepting appellant's arguments as true, summary judgment was appropriate as appellant failed:

> to identify any collusion directed at Appellant itself.
> Rather, Appellant focuses on alleged fraud that took
> place within the CF Foods account at First Union
> long before CF Foods ever approached Appellant
> for a business account. Again, at most, the record
> reflects that First Union allowed CF Foods' account
> to remain open, thus allowing CF Food to use it as a
> reference for getting an account with Appellant.

Commerce, 911 A.2d 143. The court further noted that "Appellant's version of the facts, however, simply does not establish that CF Foods and First Union worked together in a common scheme and with shared intent to harm Appellant. Rather, the decision to approach Appellant for a bank account appears to have been CF Foods' decision alone." Id.

Similarly, in Brett Senior, the court denied Plaintiff's civil conspiracy claim arising from the departure of one of its employee to another company. Brett Senior, 2007 U.S. Dist. LEXIS 50833, at *2. Plaintiff sued the former employee and his new employer alleging a civil conspiracy, based on the decision of some of plaintiff's clients to become clients of the firm employing plaintiff's former employee. The court granted summary judgment, noting that while defendants may have desired to obtain some of plaintiff's clients there was "no evidence that [defendant] desired to accomplish this through unlawful means." Id.

But, unlike in Commerce or Brett Senior where there was no evidence that the accused collaborated in any misdeed, the evidence suggests RDK's involvement in Worldwide's efforts to defraud Mack. The Huffman and Van Ahn emails to Richard Kemner suggest an active

61

effort, by Worldwide and RDK, to misrepresent sales to Mack.  The Huffman email informed

Kemner that Worldwide needs "Clean Earth info to apply for additional money.  Mike has

already priced you these units at Rumpke's cost (under discretionary terms we discussed) at

$106,500.  Hopefully Clean Earth will get deeper than that."  (Mack's Resp. Mot. Summ. J. 18

(quoting Ex. 14,  Huffman Mar. 29, 2006 email).)  This evidence shows RDK's awareness and

involvement in Worldwide's misrepresentations.

      Similarly, Van Ahn's May 19, 2006 email shows that several different

misrepresentations were afoot:  (1) obtaining sales assistance for RDK by purporting that the

trucks were destined to Clean Earth or Rumpke; (2) looking for ways to avoid paying excise tax;

and (3) attempting to mark new trucks as used.  The Van Ahn email stated:  "[a]s discussed on

the phone, if Bill Rumpke will agree, he will need to sign off on the titles showing them as used

trucks being sold to you."  (Id. at 41 (citing Ex. 32, Van Ahn May 19, 2006 email).)  This email

indicates that RDK aware of Worldwide's efforts, and discussed how to best execute these plans.

Kemner's involvement in this effort is further suggested as Van Ahn noted that, "[o]ne of the

challenges of this process will be the FET, since Rumpke is non-exempt I see no way to get

around paying that, maybe Sam or you have some input that I don't see."  (Id.)  Van Ahn

explicitly solicits guidance from Huffman, a colleague at Worldwide, and RDK's Kemner.

      Van Ahn's September 15, 2006 email can be read as discussing ways that

Worldwide and RDK could conspire to submit fraudulent sales slips to Mack.  The reaction of

Richard Kemner to this email is telling.  Kemner, in his January 2006 deposition stated:

        THE WITNESS: Okay.  **This is an attempt with,**
        **under the advice of Mr. Todd Van Ahn, to**
        **secure additional discounting by using Clean**

> **Earth, which at that time was the E-Z Pack dealer who was in his responsibility.**  In order to do this, Van Ahn told Mack that these trucks sold to RDK were actually being sold to Clean Earth.

(Id. at 17 (quoting Ex. 13, Van Ahn Sept. 15, 2006 email) (emphasis added).)  Kemner is clear that Van Ahn was advising RDK.  Unlike in Commerce or Brett Senior, where there was no evidence that the accused collaborated in any misdeed, the evidence suggests RDK's involvement in Worldwide's efforts.

Regarding the seventeen RDK-Worldwide transactions, Mack has presented evidence sufficient to convince a reasonable factfinder that RDK not only knew of Worldwide's mis-representations, but also participated in them.  RDK argues the underlying conduct enabled it to buy Mack chassis at a lower price and thus advanced its business interests, thereby negating "any alleged intent to injure."  (Pls.' Mot. Summ. J. 25 (quoting Constitution Bank v. DiMarco, 836 F. Supp. 304 (E.D. Pa. 1993) (internal quotes omitted); see WM High Yield Fund, 2005 WL 1017811, at *14 (noting that actions taken to advance one's business, while deceptive, did not indicate malice as these actions advanced a legitimate business interest).)

Thompson Coal and its progeny are clear, however, to sustain a claim of civil conspiracy, malice or an intent to injure must be the sole intent.  Thompson Coal, 412 A.2d at 472.  But the fact that an action advances one's business interest is not sufficient to warrant summary dismissal.  As the court in Daniel Boone Area Sch. Dist. noted:

> The language in Thompson Coal . . . is a characterization of evidence adduced at the summary judgment stage, and the import of that language is that, as a matter of fact, there was no malice in that case because the defendant was acting for its own legitimate business purposes and any

63

> injury to the plaintiff was a mere secondary and
> unintended effect of the otherwise proper conduct.

187 F. Supp. 2d 400, 411-12 (W.D. Pa. 2002).  The Daniel Boone court denied summary

dismissal as the alleged actions in question, while economically beneficial, were not lawful and,

resultingly, indicated malice sufficient "for civil conspiracy."  Id.

  Similarly, Mack is not alleging that the legitimate business actions of RDK and

Worldwide form the basis of its civil conspiracy claim.  Instead, it is the improper actions of

RDK and Worldwide that—while economically beneficial to them—form the basis of Mack's

civil conspiracy claim.  Mack alleges that Worldwide and RDK conspired to use Clean Earth/EZ

Pack as pass-throughs by which Worldwide improperly obtained sales assistance.  This

allegation, and the evidence supporting it, could lead a reasonable fact-finder to infer that Mack's

injuries were not simply an incidental side-effect of otherwise legitimate business interests, but

rather the fruits of an unlawful conspiracy.  These alleged actions are not equally "consistent with

innocence."  Scully, 238 F.3d at 517.  At this stage, Mack alleges malice sufficient to survive

summary judgment.

  Further, it is clear that Mack has provided evidence showing all the elements

necessary to support a fraud claim.  Mack has alleged that RDK and Worldwide engaged in

misrepresentations and fraudulent utterances with the hope that Mack would rely upon them.

Mack granted Worldwide sales assistance on the seventeen chassis—something it would not do

had it known these sales were intended for RDK.  At this early stage, Mack's claim of $140,000

in damages is sufficient evidence that it proximately suffered damages as a result of the RDK-

Worldwide transactions.[29]

   Given this evidence, there exists sufficient questions of material fact such that

summary judgment is not warranted.  Accordingly, RDK's Motion for Summary Judgment, as it

pertains to the seventeen RDK-Worldwide transactions, is denied.

## 2.  Dallas Mack Transactions

   As noted previously, Dallas Mack is RDK's Mack dealer of choice.  It is also the

dealer that purportedly engaged in forty-five fraudulent transactions with RDK resulting in

roughly $240,000 in damages.  (Mack's Resp. Mot. Summ. J. 22-23.)   The Molder Report

divides the RDK-Dallas Mack transactions into three categories:  (1) "After Dogs Gone Wild;"

(2) "Dogs Gone Wild;[30]" and (3) "Undisclosed Truck Returns."  (Id. at 10 (citing Ex. 4, Molder

Report 8-15).)  Mack claims that these transactions are evidence of a conspiracy to defraud

Mack.  RDK asserts that these forty-five transactions are part of a consignment agreement

---

29.   RDK posits two theories as to why Mack has suffered non-existent and speculative damages.  (Pls.' Mot.
Summ. J. 32-35.)  Both theories are without basis.  First, RDK asserts that "Mack wrongly assumes, without any
evidentiary basis, that the Mack dealers would have purchased every truck at issue from Mack without ESA."  (Pls.'
Mot. Summ. J. 33.)  Second, "Mack also assumes, again without any evidentiary basis, that RDK or some other third
party would have purchased the same trucks from the Mack dealers at any price at which the Mack dealers offered
the trucks, even if the Mack dealers received no ESA from Mack."  (Id.)  Without belaboring the point, RDK's
argument lacks foundation as it appears to be asserting that but for RDK's alleged fraudulent purchases, Mack might
not have sold any of these chassis and, as a result, damages cannot be determined.  In essence, RDK asserts that the
alleged fraud actually helped Mack sell trucks that it otherwise might not have sold.  Without addressing the merits,
or demerits of this argument, this Court will note that Mack, by tallying the alleged fraudulent sales assistance, has
provided sufficient evidence of damages to withstand summary judgment.  Further, RDK notes that Mack "took
absolutely no steps to mitigate its alleged losses."  (Id. at 34.)  Mack, as master of its Counterclaim, may pursue
damages from the liable party of its choosing.  Mack could have sought to join Dallas Mack, Worldwide, or Nextran.
It was within Mack's right to decide not to do so.  Should Mack's claim prevail, RDK may seek indemnification
from its alleged co-conspirators.

30.   RDK notes that "Dogs Gone Wild" was a Mack promotional campaign, and suggests that a distinction between
sales made during and after this promotional was made so that Mack can claim "additional damages relating to the
extra incentives provided under the Dogs Gone Wile program."  (Id. at 11 n.12.)

between Dallas Mack and RDK.  (Id. at 11.)  Further, RDK claims that Mack knew of this consignment relationship.  The Court considers the parties' evidence with respect to each of these categories and then analyzes whether such claims survive summary judgment.

### i.       After Dogs Gone Wild

Of the forty-five RDK-Dallas Mack transactions in question, twenty-one involve a conspiracy similar to the Worldwide transactions.  Namely, Dallas Mack allegedly represented that it was selling Mack chassis to different end users when, in fact, they were sold to RDK.  (Id. at 22.)  These twenty-one transactions comprise the grouping dubbed "After Dogs Gone Wild."

RDK posits that Dallas Mack listed the end users—and not RDK—in its sales assistance requests due to its misunderstandings of the proper protocol for requesting Mack sales assistance.  (Id.)  Thus, while Mack asserts that Dallas Mack's decision to list the end user, and not RDK, constituted active "misrepresentation," RDK counters that when Dallas Mack listed the end user—and not RDK—it thought it was following the "proper ESA request procedure."  (Id.) RDK argues that this confusion was understandable as Mack did not utilize a standard, uniform procedure for requesting sales assistance.  (Pls.' Mot. Summ. J. 8-9.)  In fact, RDK asserts that "[m]ultiple Mack dealers and Mack's own Rule 30(b)(6) designee testified under oath that Mack considered it appropriate for Mack dealers to indicate the *end user* on an ESA request, as opposed to naming a third party distributor like RDK as the customer on an ESA request."  (Id. at 9 (noting Campbell Dep. 62:3-63:25; Ralich Dep. 35:4-22; Gerhard Dep. 151:5-18) (emphasis in original).)

In contrast, Mack asserts that the fraud involving the twenty-one chassis arose in a two-fold manner:  (1) sales assistance was requested in the end user's and not RDK's name; and

(2) sales assistance requests were made after the trucks had been sold to RDK. (Mack's Resp.

Mot. Summ. J. 23 (citing Ex. 4, Molder Report 9, "Through a combination of past sale, or

entirely fabricated ESA requests and RDN submissions, Dallas Mack obtained sales assistance,

rebates and sales rep's commission to which it was entitled for trucks which RDK actually

sold.").)

        In response, RDK notes that the listed end users, in Dallas Mack's request for

sales assistance, were the same end users who "actually purchased and operated the trucks."

(Pls.' Mot. Summ. J. 12.) Arlyn Campbell, of Dallas Mack, testified that he "never 'tried to

hide' the identity of the purchaser of these trucks from Mack." (Id. (quoting Campbell Dep.

65:13-16).) RDK provides further evidence of a consignment arrangement[31] as "RDK stocked

trucks owned by Dallas Mack on RDK's premises and helped Dallas Mack find end users to

purchase the trucks." (Id. at 5 (citing Campbell Dep. 89:10-90:1; Kemner Decl. ¶¶ 4-5).) At all

times, Dallas Mack owned the consigned trucks until a buyer was located and title transferred to

that buyer. (Id. (citing Campbell Dep. 55:18-56:19).) In fact, Dallas Mack paid "floor plan

interest" to RDK for storing these trucks. (Id. (citing Campbell Dep. 55:13-17).) RDK avers that

the chassis in question were sold before Dallas Mack obtained Mack sales assistance. (Id. at 12

(citing Ex. 5, Pocalyko Report 12 (noting that "[t]he Molder Report presumes a sale occurred

upon issuance of a tracking invoice without regard to proper treatment under GAAP" and noting

that the Molder Report's conclusions cannot be "reconciled with" information provided by

Dallas Mack's Arlyn Campbell among other things)).)

---

31.  (Id. (citing Ex. 8, Campbell Dep. 89-91 (describing the nature of the Dallas Mack-RDK consignment arrangement)); (Ex. 23, Vadia Jan. 13, 2005 email.)

Further, RDK asserts that Mack knew of the RDK-Dallas Mack consignment relationship, as Mack "delivered the Dallas Mack consignment trucks directly to RDK." (Pls.' Mot. Summ. J. 5) (citing Ex. 8, Campbell Dep. 89:15-17).) RDK also notes that Volvo Commercial Financial, which has the same corporate parent as Mack, "routinely audited the Dallas Mack consignment trucks at RDK's premises in Tampa." (Id. at 11 (citing Ex. 10, Kemner Decl. ¶ 10).)

Mack posits the example of Mack chassis G337 as emblematic of the RDK-Dallas Mack "After Dogs Gone Wild" fraud. Chassis G337 was invoiced to Dallas Mack on July 5, 2004. (Mack's Resp. Mot. Summ. J. 23.) In August 2004, RDK proposed a sales agreement for this truck with Gateway Rolloff Service. (Id. (citing Ex. 18, RDK Truck Purchase Agreement).) Mack's Molder Report noted that "RDK paid Dallas Mack as shown" by the check stub on October 19, 2004. (Id. at 24 (quoting Ex. 12, Molder Report Ex. 2, 4).) The next day, Dallas Mack prepared a bill of sale transferring chassis G337 to RDK. (Id. (citing Ex. 20, Dallas Mack October 20, 2004 bill of sale).) But on November 1, 2004, Dallas Mack sought sales assistance so that it could sell chassis G337 to Gateway Rolloff Services, even though a bill of sale to RDK had previously been completed. (Id.) RDK notes that Arlyn Campbell of Dallas Mack believed that identifying the end user (Gateway Rolloff) and not RDK was the proper procedure. (Pls.' Mot. Summ. J. 11 (citing Campbell Dep. 62:15-21).)

Finally, Mack provides RDK's sale of two Mack chassis, F122 and F144, to Nu-Life Environmental as an example of coordinated activity between Dallas Mack and RDK. Mack's expert asserts that "RDK purchased these trucks from Dallas Mack, and then sold them to Duarte West in Puerto Rico." (Mack's Resp. Mot. Summ. J. 44 (citing Ex. 12, Molder Report

14).)  Subsequently, Mack alleges that Dallas Mack requested sales assistance, claiming that it was selling the chassis to Nu-Life.  (Id.)  To cover up its purchase of the trucks, RDK "obtained a cashier's check from its bank payable to Dallas Mack."  (Id. (quoting Molder Report 14).)  Mack asserts that this was done to cover up the fact that RDK and not Dallas Mack sold these two trucks to Nu-Life.  (Id.)

### ii.        Dogs Gone Wild

With the remaining seven chassis, Mack asserts that "Dallas Mack lied to Mack about the identity of the buyers in order to obtain $47,456 of special rebates and promotional assistance."  (Id. at 23 (citing Ex. 12, Molder Report 9-10).)  The "Dogs Gone Wild" fraud included obtaining fraudulent Mack rebates in the form of the standard sales assistance discount, plus a $3000 rebate on applicable chassis.  (Id. at 28 (Ex. 24, Kelly Apr. 15, 2003 Memo).)  Mack notes that its Southwest Regional Vice President sent a May 27, 2003 memo to Dallas Mack General Manager Bob Heatherly, stating:  "[t]o confirm our phone conversation of earlier today, please be advised the eligible $3000 Rebate, which is included in the subject program, applies to retail customers only.  In other words the Rebate is not applicable for body companies such as RDK, Continental, and other non-retail users."  (Id. (citing Ex. 25, Heatherly May 27, 2003 Memo).)  Mack asserts that this memorandum reiterates Mack's policy of barring sales to end users.

Mack provides an example that it claims is indicative of the RDK-Dallas Mack "Dogs Gone Wild" fraud.  On September 5, 2002, Dallas Mack invoiced chassis F090 to RDK.  (Id. at 29 (citing Ex. 12, Molder Report Ex. 1, 2).)  On July 28, 2003, RDK sold this chassis to "WCA of Alabama, Inc. according to RDK Deal Jacket (RDK0102400).  RDK invoiced Waste

Corporation of Alabama in the amount of $112,430 for this truck (RDK0250923-924)."  (Id. at 29 (quoting Ex. 12, Molder Report Ex. 1, 2).)  But on August 13, 2003, Dallas Mack requested "a Dogs Gone Wild discount and rebate of $3,000 because Dallas Mack claimed that it sold the chassis to WCA of Alabama—even though RDK was the actual purchaser from Dallas Mack." (Id.)

### iii.    Fraudulent Chassis Returns

Regarding the seventeen chassis returned to Mack, Mack asserts that Dallas Mack misrepresented that these chassis had "always been in its inventory and either requested sales assistance to sell them or sold them to other dealers that subsequently requested sales assistance." (Id. at 29.)  Mack grants additional sales assistance to get rid of old trucks on its dealer lots, and notes that it "has no interest in relieving RDK of aged inventory, as it is not an authorized Mack Distributor."  (Id. (citing Ex. 1, Gerhard Decl. ¶40).)  By way of comparison, RDK contends that Dallas Mack consigned these chassis to RDK, "but subsequently took back and sold either to its own customers or to other Mack dealers who, in turn, sold them to their customers."  (Pls.' Mot. Summ. J. 13.)

Specifically, Mack claims that Dallas Mack sold these seventeen chassis to RDK. (Id. at 23.)  When RDK could not sell these chassis, Dallas Mack took them back.  Dallas Mack then represented to Mack that it, and not RDK owned and was unable to sell these chassis.  As a result, Mack claims to have provided $120,207 in improper sales assistance to sell these older chassis.  (Id. at 23.)  Of the seventeen chassis, Dallas Mack sold twelve of them and obtained sales assistance for each one.  (Id. (citing Ex. 4, Molder Report 10 ("After sitting on RDK's lot for months, Dallas Mack took them back to sell on either its own, or by transfer to other

dealers.")).)  The remaining five trucks were transferred to two other Mack dealers—Tri-State

Truck Center, Inc. and Buffalo Truck Center, Inc.—via a Mack program called "Dogcatcher,"

which enables dealers to list trucks that they are having trouble selling in the chance that other

dealers might have a customer for them.  (Id. at 13 n.15.)  The dealer who finds a customer

applies for sales assistance.  (Id.)

### iv.    Analysis

Having considered the above evidence, the Court declines to grant summary

judgment with respect to the forty-five, RDK-Dallas Mack transactions on several grounds.

First, RDK  asserts that Mack knew of its consignment relationship with Dallas

Mack, because Volvo Financial, which has the same corporate parent as Mack, audited RDK's

Tampa facility.  Mack disputes this assertion, noting that while Mack and Volvo Financial have

the same corporate parent, "there is little communication between Mack and Volvo Financial," as

they do not share any employees, officers, directors, or computer systems.  (Mack's Resp. Mot.

Summ. J. 27 (citing Ex. 21, Engels Decl. ¶¶ 7-8).)  Further, Mack claims that "Volvo Financial

has a corporate policy of never approving consignment relationships and Volvo Financial never

approved of Dallas Mack-RDK consignment relationships."  (Id. (citing Ex. 21, Engels Decl. ¶¶

7-8).)

RDK also claims that Mack was aware of the arrangement because it delivered

chassis directly to RDK's facility for Dallas Mack.  Again, Mack disputes this assertion noting

that "regardless of delivery, the invoices in question are no more than 'tracking invoices' for

inventory purposes only, and as such do **not** document sales."  (Id. at 28 (quoting Ex. 22,

Pocalyko Report 11-13) (emphasis in the original).)  Mack disputes the existence of a

71

consignment relationship noting that RDK has never produced a "written consignment agreement between it and Dallas Mack." (Mack's Resp. Mot. Summ. J. 27.) In fact, the Molder Report concludes that, based on Generally Accepted Accounting Practices (GAAP), the RDK-Dallas Mack transactions were for the "sales of chassis, not consignments." (Id. (citing Ex. 12, Molder Report 12).)

Second, regarding the seven "Dogs Gone Wild" and the twenty-one "After Dogs Gone Wild" transactions, Mack has presented evidence—in the form of receipts—suggesting that Dallas Mack and RDK entered into a combination, evincing a common purpose, to defraud Mack. RDK, in its Motion for Summary Judgment, asserted that, as part of its consignment relationship, Dallas Mack owned the consigned Mack chassis until they were sold to the end user. (Pls.' Mot. Summ. J. 12.) RDK further notes that in all these consignment sales, the identified end users "were one and the same and that those end users actually purchased and operated the trucks." (Id.) This proves nothing. The issue is not whether Gateway Rolloff, Waste Company of Alabama, and Nu-Life were the end users. No one disputes that they were the end users. Rather, the dispute is about who sold the chassis to the end users: Dallas Mack or RDK? RDK stated in its Motion for Summary Judgment that Dallas Mack owned the consigned trucks until they were sold to the end user. The sales invoices produced by Mack—showing that the chassis were sold to RDK before being sold to Gateway Rolloff and the Waste Company of Alabama—run directly counter to this claim.

Similarly, Mack asserts that RDK used a cashier's check, instead of one of its own checks, to purchase two Mack chassis that it was selling to Nu-Life Environmental. (Id. at 44.) According to Mack, this was done to conceal the fact that RDK, and not Nu-Life, was the

customer.  (Id.)  Competing claims about the sale of these chassis to Nu-Life Environmental further suggest the existence of factual disputes making a grant of summary judgment improper as these competing claims create a battle of sales receipts.

Relatedly, RDK asserts that it provided end user information to Dallas Mack so that it could properly obtain sales assistance.  RDK avers that this information was simply the name and address of the end user which "RDK submitted to Dallas Mack so that Dallas Mack could file a delayed warranty registration form with Mack."  (Id. at 12 (citing Ex. 22, Molder Dep. 71:24-72:14).)  Mack disputes RDK's claim noting that RDK never submitted warranty registration information "to Dallas Mack for any of the Dogs Gone Wild chassis, and instead submitted the information directly to Mack."  (Mack's Resp. Mot. Summ. J. 43 (citing Ex. 34, RDK facsimiles to Mack).)  Mack goes on to argue that there was "no legitimate reason for RDK to communicate information about its customers to Dallas Mack.  A reasonable jury could well conclude that this information sharing is yet more evidence of RDK's 'knowing participation' in the fraudulent scheme."  (Id.)

Finally, with regard to the seventeen returned chassis, the Court is faced with competing factual assertions.  RDK claims that these are "trucks that Dallas Mack originally consigned to RDK but subsequently took back."  (Pls.' Mot. Summ. J. 13.)  Conversely, Mack asserts that there was never any consignment relationship but rather "Dallas Mack sold [to RDK]. . . and RDK returned the chassis to Dallas Mack."  (Mack's Resp. Mot. Summ. J. 29.)  These seventeen chassis are part and parcel of a larger, alleged RDK-Dallas Mack consignment relationship.  The existence of this relationship is at the core of the dispute between Mack and RDK:  either there was or was not a consignment relationship.

As with the Worldwide-RDK transactions, Mack asserts that the Dallas Mack-RDK transactions were improper, evincing no legitimate business purpose.  As such, the very existence of the transactions constitutes evidence of malice.  Like Worldwide, Dallas Mack was aware that Mack dealers were not to provide sales assistance when selling chassis to third party dealers, such as RDK.  By providing evidence that RDK-Dallas Mack sought to improperly obtain assistance from Mack, Mack has provided evidence of malice sufficient to withstand summary judgment.

Further, it is clear that, at the summary judgment phase, Mack has provided sufficient evidence to support a fraud claim.  Mack's argument that there was no consignment relationship affects all forty-five claims.  Had Mack known of such a relationship, it asserts that it would not have provided any sales assistance, Dogs Gone Wild rebates, or Dogcatcher incentives.  That Mack provided such assistance suggests that there were misrepresentations, fraudulent utterances, and an intention that Mack rely upon them.  As with the Worldwide transactions, RDK suggests that there "is no evidence in the record that RDK participated in any way in Dallas Mack's ESA requests to Mack."  (Pls.' Mot. Summ. J. 20.)  Blaming any misdeeds or mistake solely upon Dallas Mack, RDK neglects to note that its claims of a consignment agreement "raises acts and circumstances sufficient to warrant an inference that the unlawful combination had in point of fact been formed for the purpose charged."  Sands, 2008 U.S. Dist. LEXIS 2469, at *21.

Mack claims that, based upon the misrepresentations of Dallas Mack and RDK, it granted Dallas Mack considerable sales assistance.  Had Mack known that these chassis were sold to RDK, it would not have granted any of the assistance.  By alleging roughly $240,000 in

damages ($80,461 in sales assistance and $47,456 in rebates, and $120,207 in Dogcatcher

assistance) due to its reliance on Dallas Mack's representations, Mack has shown that it

proximately suffered damages as a result of the RDK-Dallas Mack transactions.  Accordingly, at

this stage, it would not be proper for this Court to resolve these factual disputes.  Mack's

allegations raise the specter that sales assistance and rebates provided to facilitate the sale of

these forty-five chassis was based upon misrepresentations, fraudulent utterances, and an

intention that Mack rely upon these fraudulent utterances.  Given this, RDK's Motion for

Summary Judgment, as it applies to the forty-five RDK-Dallas Mack transactions, is denied.

### 3.    Nextran Transactions:

Mack's allegations of an improper RDK-Nextran arrangement involves two trucks

sold to Womack Sanitation (Womack).  (Pls.' Mot. Summ. J. 16.)  RDK states that Womack

ordered seven Mack chassis from Nextran.  (Id.)  Nextran ordered the Mack chassis, and received

sales assistance based upon its sale.  (Id.)  Prior to delivery, and without communicating to

Nextran, Womack learned that RDK would provide a better trade-in price, than would Nextran,

for two of the trucks that Womack was trading in to Nextran.  (Id.)  As a result, Womack asked

Nextran to invoice two truck chassis "to RDK so that RDK could mount the bodies and sell the

final packages to Womack."  (Id.)  Nextran requested sales assistance in Womack's name

because it was the intended end user, and delivered two of the seven Mack chassis through RDK,

"strictly as a courtesy to the customer."  (Id. (citing Ex. 4, Arnold Dep. 24:15).)

At the outset, Mack's allegation that Nextran and RDK conspired to improperly

obtain sales assistance rings hollow, as the basis for much of RDK's Third Amended Complaint

rests on its claim that Mack dealers, most notably Nextran, pressured Mack to deny sales

75

assistance to RDK.  (See Pls.' Mot. Summ. J. 15 & Ex. 4, Molder Report 17-18.)  Now, Mack

asserts that Nextran, whom RDK cites as a prime competitor, conspired with it to defraud Mack.

Underscoring the paucity of evidence in support of Mack's claim that RDK and

Nextran conspired to obtain improper sales assistance on these two chassis is the fact that Mack's

Response to RDK's Motion for Summary Judgment, while totaling fifty-one pages, spends only

two sentences addressing the RDK-Nextran transactions.  Those two sentences, in their entirety,

state, "[f]inally, RDK colluded with Mack distributor Nextran in Spring 2006 to defraud Mack of

$10,752 in sales assistance on two chassis.  In both instances, Nextran sold the chassis to RDK in

question to RDK but requested sales assistance in the name of a different buyer, Womack

Sanitation."  (Mack Resp. Mot. Summ. J. 30.)

By way of comparison, Mack's Response spends seven pages on the Worldwide

transactions,[32] and approximately eight pages on the Dallas Mack transactions.[33]  Absent more,

Mack's conclusory statements about the alleged RDK-Nextran transactions fails to support a

claim of a RDK-Nextran conspiracy.  Given the absence of any issues of material fact, summary

judgment, as it applies to the two RDK-Nextran transactions, is granted.

### 3.    Florida's Unfair Practices Act

Mack also asserts a claim based on Florida's Unfair Practices Act.  FLA. STAT. §

501.201 et seq.  Like its civil conspiracy claim, this claim asserts that Mack is a victim of fraud

and, as such, has a claim, under this Act and against RDK for its "unfair or deceptive acts or

practices in conduct of commerce."  FLA. STAT. § 501.204(1).  RDK's defense against this claim

---

32.  (Mack's Resp. Mot. Summ. J. 16-22.)

33.  (Mack's Resp. Mot. Summ. J. 22-30.)

76

is married to its larger defense against Mack's civil conspiracy claim.  Specifically, RDK notes

that, "[a]s with Mack's conspiracy claim, Mack has not adduced sufficient evidence to create a

triable jury issue regarding its FDUTPA (Fairness Act) claim."  (Pls.' Mot. Summ. J . 32.)  RDK

cites Beale v. Biomet,  492 F. Supp. 2d 1360, 1373 (S.D. Fla. 2007), noting that in Beale, the

court granted summary judgment as the Fairness Act claim was "grounded on the same

allegations as plaintiff's negligence and product liability claims which failed."  (Id.)

   In direct contrast to Beale, this Court is denying the bulk of RDK's Motion for

Summary Judgment.  As such, the claims grounding Mack's Fairness Act claims remain valid.

Thus, for the reasons discussed previously when addressing Mack's civil conspiracy claims,

RDK's Motion for summary dismissal of Mack's Fairness Act claims, as it applies to the

Worldwide and Dallas Mack transactions, is denied.  Dismissal of Fairness Act claims, based on

the Nextran transactions, is granted.

   Similarly, this Court disagrees with RDK's assertion that Mack's damages claims

are "nonexistent" and "purely speculative."[34]  (Pls.' Mot. Summ. J. 32.)  Mack's claimed

damages are clear and easily calculated.  Mack alleges that, but for RDK's fraud, it would not

have provided any of the sales assistance or rebates that it granted on the sixty-four chassis in

question.  This Court has dismissed Mack's claims regarding two of those chassis.  Thus, the

total amount of damages is the sum total of the assistance provided for the other sixty-two

chassis.  RDK may dispute this calculus, and it may later provide convincing arguments showing

---

34.  This Court's disagreement with RDK's claim that Mack should have mitigated damages was addressed previously.

that this formula is in error.  At the summary judgment stage, however, RDK has failed to conclusively rebut Mack's evidence of damages.

## V.  CONCLUSION

In sum, this Court has determined that Defendant's Motion for Summary Judgment is granted in part and denied in part.  RDK's federal and state antitrust claims are dismissed in their entirety.  Summary dismissal of RDK's state law claims, as they apply to Mack, McNeilus, and Heil, is denied.  RDK's state law claims, as they apply to the alleged conspiracy between Mack and its dealers, are dismissed

RDK's Motion for Summary Judgment on Mack's Counterclaims is granted and denied in part.  With regard to the two alleged RDK-Nextran transactions, summary dismissal is granted.  With regard to the seventeen RDK-Worldwide and sixty-two RDK-Dallas Mack transactions, summary judgment is denied.

An appropriate order follows.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| RDK TRUCK SALES AND | : | |
| SERVICE INC. and RDK | : | |
| MUNICIPAL TRUCK CENTER, INC. | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| MACK TRUCKS, INC., | : | NO. 04-4007 |
| MCNEILUS TRUCK | : | |
| MANUFACTURING, INC., and HEIL | : | |
| ENVIRONMENTAL INDUSTRIES, LTD., | : | |
| Defendants. | : | |

| | |
|---|---|
| MACK TRUCKS, INC., | : |
| Counterclaim Plaintiff, | : |
| | : |
| v. | : |
| | : |
| RDK TRUCK SALES AND SERVICE | : |
| INC. and RDK MUNICIPAL | : |
| TRUCK CENTER, INC., | : |
| Counterclaim Defendants. | : |
| | : |

## <u>ORDER</u>

**AND NOW**, this 19th day of May 2009, upon consideration of Defendants'

Motion for Summary Judgment (Doc. No. 92), Plaintiff's Response to Defendants' Motion for

Summary Judgment on Plaintiff's Third Amended Complaint (Doc. No. 93), Defendants' Reply

Brief (Doc. No. 94), and Plaintiff's Motion to File a Sur-Reply (Doc. No. 96) this Court

determines the following:

(1) Plaintiff's Motion to File Sur-Reply is **GRANTED**.

(2) Regarding Plaintiff's first Sherman Act antitrust claim—alleging a vertical conspiracy between Mack and Mack's Dealer Network—Defendants' Motion for Summary Judgment is **GRANTED**.

(3) Regarding Plaintiff's second and third Sherman Act antitrust claims—alleging an antitrust conspiracy between Mack, McNeilus, and Heil—Defendants' Motion for Summary Judgment is **GRANTED**.

(4) Regarding Plaintiff's state law antitrust claims, Defendants' Motion for Summary Judgment is **GRANTED**.

(5) Regarding Plaintiff's claims under the Unfair Practices Act, Defendants' Motion for Summary Judgment is **DENIED.**

(6) Regarding Plaintiff's claim of tortious interference, Defendants' Motion for Summary Judgment is **DENIED**.

Upon consideration of RDK's Motion for Summary Judgment on Mack's

Counterclaim (Doc. No. 95), Mack's Response (Doc. No. 97), RDK's Reply Brief (Doc. No. 98),

and Mack's Sur-Reply (Doc. No. 99), this Court determines that:

(1) RDK's Motion for Summary Judgment on Mack's civil conspiracy claims is **GRANTED AND DENIED IN PART**. With regard to the two alleged RDK-Nextran transactions, summary dismissal is **GRANTED**. With regard to the seventeen RDK-Worldwide and forty-five RDK-Dallas Mack transactions, summary judgment is **DENIED**.

(2) RDK's Motion for Summary Judgment on Mack's Unfair Practices Act claim, is **GRANTED AND DENIED IN PART.** With regard to the two alleged RDK-Nextran transactions, summary dismissal is **GRANTED**. With regard to the seventeen RDK-Worldwide and forty-five RDK-Dallas Mack transactions, summary judgment is **DENIED**. This Court dismisses RDK's claim that damages under the Unfair Practices Act are nonexistent and speculative.

2

**IT IS SO ORDERED**.

BY THE COURT:


*S/ Ronald L. Buckwalter*
RONALD L. BUCKWALTER, S.J.

3